23 N.Y.2d 458 (1969)
In the Matter of Council of Supervisory Associations of the Public Schools of New York City et al., Respondents-Appellants,
v.
Board of Education of the City of New York et al., Appellants-Respondents; Parent Development Program of the Two Bridges Neighborhood Council, Inc., Intervenor-Appellant-Respondent, and Louis Fuentes et al., Intervenors-Appellants.
Court of Appeals of the State of New York.
Argued November 20, 1968.
Decided January 15, 1969.
J. Lee Rankin, Corporation Counsel (Stanley Buchsbaum, Sanford I. Freedman and Lawrence Cherkis of counsel), for Board of Education of City of New York, appellant-respondent.
Robert Sugerman and Harold J. Rothwax for intervenor-appellant-respondent.
William M. Kunstler and Jeremiah Gutman for intervenors-appellants.
Max H. Frankle, Everett E. Lewis and Bernard Yaker for respondents-appellants.
Burt Neuborne, Paul G. Chevigny, Alan H. Levine and Sheldon L. Berens for New York Civil Liberties Union and others, amici curiæ.
Chief Judge FULD and Judges BURKE, KEATING, BREITEL and JASEN concur with Judge BERGAN; Judge SCILEPPI dissents and votes to affirm in a separate opinion.
*462 BERGAN, J.
In 1967 the Legislature declared it to be the public policy of the State to encourage community interest in the public schools of New York City and to develop an educational program in the public schools concerned with local community needs (L. 1967, ch. 484).
This public policy was laid down by the statute in specific terms. It was found by the Legislature that greater community "awareness and participation" were essential both to "excellence" and "innovation" in schools.
It was declared that the "creation of educational policy units" within the city-wide school district would accomplish two things: an opportunity for the community to take a more active "and meaningful" role in the schools and the development of an educational policy "closely related to the diverse needs and aspirations of the community" (§ 1).
The statute directed this policy be implemented by the preparation and submission to the Legislature, the Governor and the Regents of a plan for school "decentralization" (§ 2).
This legislative policy and its implementing directions were addressed to a palpable school problem of growing intensity and difficulty. It is the accepted hypothesis of objective anthropologists throughout the world that the distribution of basic intelligence in the human race is approximately equal among all ethnic groups. Yet it has been the experience of educators that Negro and Puerto Rican children living in economically deprived areas in New York City were handicapped at the very beginning of their primary school education and started behind their fellow white students.
The testing standards of educational ability and performance were, naturally enough, measured by achievement valued by professional teachers, e.g., reading, arithmetic, writing, spelling, *463 correct speech. While these skills are not, of course, the ultimate test of either the intelligence or the potential development of a child, they seem to be the indispensable bases of personal success in any technically highly developed country of our period. To see this in broad perspective it might be useful to compare the demands for technical skills in the United States, England, France, Japan and Russia.
This initial handicap of the nonwhite child, when he first came to school, it was found on a broad statistical scale, was not redressed under the ministrations of the public schools. It got worse. At the end of the eighth grade the nonwhite child was relatively farther behind his white fellow-pupil than he had been at the beginning; at the end of the 12th grade the disparity increased.
It became obvious the traditional public school teaching was not succeeding in imparting to a very substantial segment of children the basic educational tools needed for ultimate economic usefulness. This failure to teach what is indispensable to any significant personal opportunity in present-day life had two main consequences: it tended to compel the child as he grew up to remain in the dismal and ghetto-like conditions of an economically underprivileged community and to solidify the alienation of that community with fateful consequences; and it aroused in the nonwhite community a quite reasonable demand that public school teaching methods be recast to give its children the necessary essential skills.
To recast public school teaching to correct its deficiencies in this large class of pupils became the purpose to which many educators gave attention. The deficiencies were related to the conditions of life in which the child lived. It was a problem of appalling difficulty. Since methods which worked well enough with pupils coming from a white background failed to work with children from nonwhite backgrounds and since the basic intelligence of both groups must be presumed equal, some factors deep in the matrix of the community could be seen to play a part in the failure.
No one had an adequate answer but the strongest demands of good sense called for a solution. The area was one in which experimentation, the testing of new ideas inductively, pointed an obvious direction for public policy. It is with this background *464 that chapter 484 of the Laws of 1967 must be read. The statute did not spring up in a vacuum.
One experimental idea investigated by the Board of Education of the city as early as 1962 on the basis of poor showing of pupils in slum areas was to attempt to interest and involve parents in these areas in the public school program. A possible means to achieve this was decentralization of school administration into smaller units.
The board in 1966 sought to implement this and, closely related in time to the enactment of the 1967 statute, announced a plan for decentralization. After the statute was passed, the board determined to proceed with some demonstration projects based on the concept of decentralization. These would, it was hoped, help meet present needs as well as guide future legislation and policy.
The board determined that "new techniques and new approaches" were needed to train staff and for "increasing parental and community involvement". It also determined that in "demonstration" schools which were essentially experiments in wider co-operation between the school and the community, the principal should be a person who, having conventional educational qualifications, also understood the cultural strength and energies of the pupils and the community. This present case is concerned solely with principals.
The board was of opinion that the general training and competitive tests for principals were not addressed to these special needs. The State Commissioner of Education to whom the question of the board's authority to create the new kind of principal positions was referred approved it on August 21, 1967 by letter to the board. He stated it had power to "designate a special kind of grade of principals' license designed specifically for the project".
This new principal position, the Commissioner noted, should be filled by an "appropriate examination" from a "special eligible list". Until the list was promulgated the Commissioner decided the Board of Education could appoint a person "to serve in an acting capacity".
The Board of Education acted on this advice and in pursuance of the policy direction of the 1967 statute. On September *465 27 the board created a new position: "Principal, Demonstration Elementary School". On the same day the board made three temporary appointments as "Acting" Demonstration Elementary School Principal, those of Irving Gerber, William H. Harris and Louis Fuentes; and on November 15 appointed Ralph Hugo Rogers.
It will be remembered that the board had previously determined the existing elementary principals list was inappropriate for the position of Demonstration Elementary School Principal. It is with the legality of these appointments this proceeding is concerned. The court at Special Term annulled these appointments as "invalid" and the Appellate Division by a closely divided vote affirmed. The Appellate Division majority was of the opinion that the Special Term was right in holding that the old title of Principal Elementary School was "at least equal" to the new position of Principal, Demonstration Elementary School and that, therefore, the latter was not a new position. So the board's action was annulled.
The scope of judicial review in a case of this kind is precise and well understood. The court must determine two questions: (a) whether the act reviewed is within the statutory power of the public agency; and (b) if it is, whether the decision within the frame of power is arbitrary (Matter of Marburg v. Cole, 286 N.Y. 202).
The power of the Board of Education to create new positions which in its judgment are required is expressly vested by statute and it is placed beyond all doubt (Education Law, § 2554; cf. Matter of Disbrow v. Board of Educ., 276 App. Div. 1015). The questions of wisdom, necessity and policy are for the board, not the court (Matter of Jaffe v. Board of Educ., 265 N.Y. 160, 164-165).
There was here no unlawful delegation of authority to any local board. The undisputed official documents in the record show the City Board of Education created the new title and temporarily filled it because it deemed the existing principal list inappropriate.
The wisdom of the decision could be arguable one way or another. But because it is disputed on the record leaves no room for purported fact-finding for the court to hold as a matter *466 of law that the new type of principalship was unnecessary or that it was the same as the old one.
The board's judgment, as expressed in its official record, was that, in obtaining flexibility in the decentralized schools, the principalship "is the pivotal factor in the operation of the program". The program itself, the Superintendent testified, required a principal "to run much more of a community-centered school than we have ever asked a principal to operate before".
It was the board's judgment that the persons on the present principal list had not been examined for this added experience element in administration and hence the new position should be established with additional tests and standards for appointment.
This experience with community relations was not a matter, merely, of empathy or sympathy. It was a matter of actual working in a discipline which the board believed could be tested by objective standards.
In this purely administrative and policy judgment it cannot reasonably be said by the court, acting within the frame of its jurisdiction, that the board was wrong as a matter of law or fact in making its judgment; or in deciding that the newly described position was different from the old.
A careful reading of People ex rel. Sweeney v. Rice (279 N.Y. 70) does not leave it open to the court to say that the new principal position was either unnecessary or was the same as the old. The court there held the ruling of the Civil Service Commission was arbitrary because it had failed to show any valid ground why its separate treatment of two stenographic positions "was reasonable as a matter of law" (p. 73). But the board here shows a valid ground for distinction between the two positions and an entirely reasonable one; and so its action cannot be stamped by the court as arbitrary.
The logical reasons for the action of the board are spread over the record and the differences in the positions are as significant as the reasons which underlie the board's action.
Nor are the temporary appointees named by the board to the new positions professionally unqualified, as it has been suggested. The Superintendent of Schools testified that each temporary appointee "has a certificate from the State of New York that he is qualified to be a principal of a school".
*467 Running through the contentions of respondents-appellants is the suggestion that the temporary appointments were made on the basis of race and hence discriminatory and invalid (N. Y. Const., art. I, § 11). If an educational problem be concerned with a failure to reach an ethnic group, it can scarcely be imagined that the Board of Education, in creating a school position to deal with this problem, would not require special experience with the ethnic group for essential qualifications.
The position could not lawfully be filled on the basis of race; but experience with the race problem in relation to education should become an essential and objectively measured standard for the position.
The fact some proponents of experimental changes argued this would mean selection only from members of the ethnic groups themselves, as this record suggests, is not decisive. Nor is this viewpoint controlling on the board. This is not the basis on which the new position was described and promulgated in the official records of the board.
Nor was race the test which the board declared it followed in making the actual temporary appointments and the board, as a high-ranking and responsible public agency in charge of one of the world's largest educational systems, is entitled, as a minimum, to the presumption that its official acts are lawful and are honestly motivated.
The criteria of qualification on which the temporary appointments of Demonstration Elementary School Principal were based are laid out in the record by officers of the board. The temporary appointees had given evidence, as the Superintendent testified, that they had participated "in youth activities outside the school" and had taken part in "community participation to a great degree in other areas, both in and out of the city". This is in addition to being technically "qualified to be a principal of a school" and indicates for the new position experience not normally required of elementary school principals.
The skills sought to be recruited for the position, which were considered in forming a judgment on the temporary appointments and which will be tested in competitive examination for permanent appointment, as explained by Alfred Giardino, then president of the Board of Education, involve a "knowledge and *468 relationship with disadvantaged communities, the cultural level there, the means and methods of securing increased parental involvement, the ability to stimulate them and the community to engage in a broader based educational project".
These imply exacting and difficult new demands on the principals. There seems no reason to believe the qualifications cannot be tested objectively and competitively or to suspect that the Board of Education in good faith did not use standards which its officers have laid down in their testimony as a basis for the temporary appointments. But the temporary appointments should continue only until a competitive list is established and now, after over 15 months, competitive examinations should shortly be announced and held on the criteria that have been laid down.
In laying down the standards by which these special principal positions will be filled on a permanent basis, the board, in co-operation with the Board of Examiners, will be required to set up specific and objective criteria of experience in the area of community-education programs. All of the criteria for testing need not be laid down in detail when the new position is initially created.
These elements are reasonably subject to specific standards for examination. Race or religion cannot, as qualifying factors, constitutionally be considered but experience can be considered. The court must presume that the board will develop and act in good faith upon relevant criteria tested in competitive examination to fill the positions permanently. It is enough for a court to be able to see that by description of function it was not unreasonable for the board to rule it different from the existing position. It is clear from the testimony of the Superintendent that the specifications were being worked out at the time of the trial and will be submitted to legal and examining authorities in the department.
The constitutional argument that the creation of new positions and filling them temporarily violates the competitive requirements for the civil service (N. Y. Const., art. V, § 6) answers itself. If no new position could ever be created, the civil service would be frozen into immobility; and if temporary appointments could not be made, progress would be impeded. The *469 answer to these questions has been given before this (Matter of Jaffe v. Board of Educ., 265 N.Y. 160, supra; Matter of Disbrow v. Board of Educ., 276 App. Div. 1015, supra).
The civil service provision has been viewed sensibly against the needs and requirements of emergency or special situations. A good example of this is Matter of Social Investigator Eligibles Assn. v. Taylor (268 N.Y. 233). Another is Matter of Mandle v. Brown (5 N Y 2d 51).
The experimentation which is the basis of this proceeding may not solve the problem. But it is not being solved by rigid adherence to past techniques. The Legislature and the responsible education officers of the State and city have seen experimentation as a possibility of improving the education of children in slum areas. The court ought to give it a reasonable chance of success.
The fear has been expressed that to sustain the board in this case will break down the merit system in the civil service and impair the rights to appointment and promotion of those on the established lists.
This decision will have no such consequences. It is limited to a well-recognized power to create new positions for new needs and to fill them temporarily until lists based on examinations can be promulgated. The court will not permit such a procedure to be used as a device for evasion of the civil service requirements and by appropriate proceeding will enforce compliance if evasion is established.
And, additionally, the court expressly limits the scope of this decision to the status of Principal, Demonstration Elementary School. The decision is not concerned with, nor does it affect, the status of any teacher.
The order should be reversed, without costs, and the petition dismissed.
SCILEPPI, J. (dissenting).
I am for affirmance for the reasons stated by Presiding Justice BELDOCK in his majority opinion at the Appellate Division. I merely add the following to further amplify my position.
The sole issue presented for our consideration is whether or not the Board of Education has, in fact, created a new position so as to justify its temporary appointments of persons other *470 than those presently qualified and listed on the civil service list as "Principal, Day Elementary School".[1]
It is conceded that the Board of Education has the right pursuant to subdivision 2 of section 2554 of the Education Law to create new positions which in their judgment may be necessary for the proper and efficient administration of its work.
Furthermore, I would agree that temporary appointments are permissible to give the board an adequate opportunity to prepare a new examination designed to establish a "special eligible list" of persons particularly qualified to fill these "new" positions. However, before such action can be lawfully initiated, it is incumbent upon the board to manifest that the qualifications for the new positions are sufficiently distinguishable from the qualifications of those persons presently on the eligible list, so as not to violate their rights under the State Constitution (art. V, § 6; People ex rel. Sweeney v. Rice, 279 N.Y. 70).
The majority states that "[a]ll of the criteria for testing need not be laid down in detail when the new position is initially created * * * It is enough for a court to be able to see that by description of function it was not unreasonable for the board to rule it different from the existing position". I am not at variance with this statement. However, it is my opinion, as it was the opinion of the trial court and the majority in the Appellate Division, that the qualifications for the two positions are indistinguishable, and, therefore, the board's action should be characterized as unreasonable.[2]
The majority states that:
"The board determined that `new techniques and new approaches' were needed to train staff and for `increasing parental and community involvement.' It also determined that *471 in `demonstration' schools which were essentially experiments in wider co-operation between the school and the community, the principal should be a person who, having conventional educational qualifications, also understood the cultural strength and energies of the pupils and the community * * *
"The board was of the opinion that the general training and competitive tests for principals were not addressed to these special needs."
This is merely a conclusion which is unsupported by the record. There is no showing that the qualifications of those persons presently on the eligible list are insufficient to meet the needs of this "new" position. The only possible qualification lacking in those persons presently on the eligible list, that might be culled from the board's ambiguous description, is that they do not share the same ethnic background as the majority of students attending the schools in question. Such a distinction is clearly violative of not only the Federal (U. S. Const., 14th Amdt., § 1) but our own State Constitution (art. I, § 11) and, therefore, cannot be considered in determining whether a new position has, in fact, been created.
Apparently recognizing the insufficiency of distinction between the two positions, the Board of Education asserts that, since the Demonstration Schools are experimental, the qualifications and duties of the principals are unknown to it and the appointments to the positions were made on a temporary basis specifically to determine from the performance of those appointed what the qualifications and duties should be. If this be the case, then let them find out what the qualifications and duties should be by making their temporary appointments from the persons presently on the eligible list. At the very least, there should be a presumption of competency in favor of those persons on the list until such time as the board evidences that they are unqualified.
Therefore, I would conclude that the temporary appointments by the Board of Education were unlawful and cannot be sustained on the mere possibility that if and when the standards and qualifications are set forth they may manifest sufficient distinction to justify the creation of a new position.
I believe that almost everyone agrees that the ultimate goals sought to be achieved by the experimental project are sound *472 and necessary. However, the right to experiment in our city school system does not carry with it the right to experiment with the constitutional rights of others, no matter how desirable or expedient a particular result might be and, until such time as the board evidences that they can achieve this desirable end through means within the confines of the law, their action cannot be sustained.
Accordingly, I would affirm.
Order reversed, etc.
NOTES
[1] While it is true that the advisability of decentralization and the far-reaching effect of its philosophy are questions not properly before us, it cannot be reasonably argued that the thrust of this decision will not affect teachers, other educational personnel and civil service employees in areas other than education.
[2] Even the dissenters at the Appellate Division recognized that the distinction drawn between the two positions was insufficient to provide a rational basis for the creation of the new positions. However, they justified their disagreement with the majority finding the urgency of the times necessitated sustaining the board's action.