Victor **PORCELLI**, Francis Bigley, Arthur Shapiro, Allan M. Cohn, Helen R. Justin, Maxine F. Edelstein, Robert J. Hickey, William J. Dunne, Jr., William C. LaRusso, and Joseph Chagnon, Plaintiffs,

v.

Franklyn **TITUS**, Superintendent of Schools of the City of Newark, and the Board of Education of Newark, in the County of Essex, Defendants,

and

Bertram Coppock, Theresa David, and Charles Haynes, Intervenors.

Civ. A. No. 864–68.

United States District Court
D. New Jersey.

Aug. 14, 1969.

Bracken & Walsh, by Joseph Walsh, Newark, N. J., for plaintiffs.

Victor A. DeFilippo, Newark, N. J., for defendants.

Harris David, Newark, N. J., for intervenors.

## OPINION

AUGELLI, Chief Judge:

Plaintiffs, ten white teachers employed by the Newark Board of Education, bring this action under the Civil Rights Act, 42 U.S.C.A. § 1983, alleging that the defendants, in appointing elementary school principals and vice-principals, discriminated against them because of their race. This Court has jurisdiction under 28 U.S.C.A. § 1343.

Preliminarily, plaintiffs moved for a partial summary judgment on the issue of liability. That motion was denied without prejudice and the Court, in order to expedite the matter, directed that a plenary hearing be held on all issues.

Thereafter, the Court allowed Bertram Coppock, Theresa David and Charles Haynes to intervene in the action, as defendants, for the purpose of presenting evidence in support of the action taken by the Board of Education in this case. The Court has also permitted the American Civil Liberties Union and The Law Center for Constitutional Rights to file an amicus brief, wherein it is argued that the complaint should be dismissed. A request for a jury trial, originally requested by plaintiffs, was later withdrawn.

The basic facts are not in dispute and have been stipulated by plaintiffs and defendants. Many of the facts so stipulated have been accepted by the intervenors. It appears that on February 1, 1967, the Newark Board of Education entered into an agreement with the Newark Teachers' Association. This agreement, which was to run until February 1, 1970, in Article X thereof, dealing with promotions, provides:

A. The positions of principal, vice principal, head teacher, department chairman and counselor shall be filled in order of numerical ranking from the appropriate list, which ranking shall be determined by written and oral examinations. Appointments to the position of teacher to assist principal (formerly called Administrative Assistant) shall be made annually on a temporary basis if the Superintendent determines that such a position is necessary or desirable, and all appointments to such position shall be made in order of numerical ranking from the appropriate vice principal's list if such a list exists.

B. Such examination shall be given at regularly scheduled intervals and shall be adequately publicized in every school at least sixty (60) days in advance.

On June 30, 1967, the Board of Education amended its rules and regulations to conform to the provisions of said agreement of February 1, 1967, and Article X thereof. Pursuant to the agreement and the amended rules and regulations, there was in existence, on May 28, 1968, a Principal's List and a Vice Principal's List which contained the names and ranks of persons eligible for promotion by virtue of the scores made by them in the promotional examinations.[1]

On May 28, 1968, the Board adopted a resolution suspending all appointments from the existing lists, "pending an evaluation by the Board of Education of the present procedure for making such appointments, effective after October 1, 1968." At the same time, it was stated that "the examination for principals and vice principals would be held on June 8, 1968 as scheduled. However, no appointments would be made from the lists established by those examinations until the Board has decided how it wished to proceed."[2]

On August 22, 1968, defendant Titus recommended that the Board adopt a new procedure for making appointments to promotional positions.[3] This recom-

---

1. With respect to the Principal's List, persons listed in positions 1 through 15 had already been appointed. Plaintiffs Porcelli, Bigley and Shapiro appear on the list as eligible persons who had not been appointed. As to the Vice Principal's List, persons listed in positions 1 through 36 had already been appointed. Plaintiffs Cohen, Justin and Edelstein were eligible for promotion, but had not been appointed. Plaintiffs Hickey, Dunne, LaRusso and Chagnon do not appear on any existing promotional list. LaRusso and Chagnon had been appointed from the Vice Principal's List prior to May 28, 1968.

2. Plaintiffs Dunne, Hickey, Chagnon and LaRusso, all took the examinations given on June 8. Their names appear on the score sheet for Elementary Principal. In addition, Dunne's name appears on the score sheet for the position of Vice Principal.

3. The new procedure, as set out in one of the exhibits marked in evidence, is as follows:
PROCEDURE FOR ESTABLISHING A POOL OF CANDIDATES FOR PROMOTIONAL POSITIONS
   1. Candidates shall submit a formal application.

mendation was adopted by the Board. It is stipulated that on the same day, August 22, the Board made 55 temporary or acting appointments. Of these appointments, 35 went to whites and 20 to Negroes. None of the plaintiffs were included in the Principal and Vice Principal appointments made on that day.

Plaintiffs' complaint, in essence, is that defendants, acting under color of law, abolished the examination procedure for the purpose of appointing Negroes to positions for which they would not otherwise be eligible. They allege that appointments were made to these positions solely on the basis of race, and that plaintiffs were discriminated against solely because they are white. Plaintiffs seek damages in the sum of $500,000.00, and a "mandatory permanent injunction against the defendants herein, prohibiting them from taking any punitive measures against the plaintiffs on account of their race or for enforcing their civil rights under this action."

It is the defendants' position that the abolition of the examination system was a legitimate governmental action taken by the Board of Education to improve promotional procedures, and that such step was not taken for the purpose of favoring or restricting promotional appointments to black educators. Defendants also contend that there is no support in the record for a conclusion that the Board discriminated against white educators in making promotional appointments. They further argue that

2. Candidates in order to be eligible for inclusion in the pool shall meet training, experience, and State certification requirements as established for each promotional position. These requirements must be met prior to interview by the screening committee.

The following are minimum experience requirements:

a. For Principals:

Five years of successful contractual teaching experience in the Newark Public Schools, or ten years of successful contractual teaching experience in schools outside of Newark, three years of which shall have been on a recognized administrative level.

b. For Vice Principals, Department Chairman, and Junior High School Supervisory Assistants:

Three years of successful contractual teaching experience in the Newark Public Schools (with the attainment of tenure).

3. Candidates for the pool shall not be restricted to members of the Newark Public School staff.

4. Candidates shall be screened by a committee composed of:

a. Assistant Superintendent in charge of Personnel or a Director on his staff.

b. Assistant Superintendent from the appropriate school level.

c. A Newark school administrator from the appropriate level.

d. An educator from outside the Newark school system.

e. A Newark school teacher from the appropriate school area. No teacher shall serve on a screening committee who is a candidate for promotional position.

5. The screening committee shall recommend to the Superintendent those candidates judged to be worthy candidates for promotion. These successful candidates shall constitute the pool from which promotions shall be made.

6. The criteria for use by the screening committee shall be co-operatively developed by representatives of the N.T.A. and the Superintendent's staff.

7. New candidates shall be selected for the pool once each year in March.

8. The pools shall be in existence for a period of five years from the date of their establishment. At that time this entire procedure will be subject to re-evaluation.

9. As a result of negotiations with the N.T.A., it is recommended that all individuals who were on unexpired promotional lists, upon their request, be automatically placed in the pool for the appropriate area without prejudice. It is further agreed that all such individuals will be sent notices to this effect by the Department of Personnel.

10. As a result of negotiations with the N.T.A., all individuals who applied and paid the required fees for participation in the examinations which have been suspended by the Board of Education shall automatically be considered as having applied for inclusion in the pool. It is further agreed that all such individuals will be sent notices to this effect by the Department of Personnel. It is also recommended that all such fees for the suspended promotional examinations be returned.

even if the Court should find that the purpose behind the abolition of the examination system was to make available more Negroes for promotional appointments, this was a legitimate goal of the Board in light of the past racial imbalance that existed in the administrative ranks of the Newark school system. The intervenors join in these arguments. In addition, they argue that the Board had a positive and affirmative duty to appoint Negro administrators because the Board had, in the past, practiced racial discrimination to exclude Negroes from these administrative positions.

■ The Civil Rights Act, pursuant to which plaintiffs assert a cause of action in this Court, prescribes two elements as requisite for recovery: (1) the conduct complained of must have been done by some person acting under color of law; and (2) such conduct must have subjected the complaining party to the deprivation of rights, privileges, or immunities secured to him by the Constitution and laws of the United States. Basista v. Weir, 340 F.2d 74 (3 Cir. 1965). The Newark Board of Education is a body corporate, N.J.S.A. 18A:-10–1, which may sue and be sued, N.J. S.A. 18A:11–2, and is amenable as a "person" to suit under 42 U.S.C.A. § 1983. School Board of City of Charlottesville v. Allen, 240 F.2d 59 (4 Cir. 1956).

■■ It is clear that racial discrimination in a state or municipal school system violates the equal protection clause of the Fourteenth Amendment. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). This proscription applies equally to the employment and assignment of teachers, as it does to pupil discrimination. Wall v. Stanly County Board of Education,

378 F.2d 275 (4 Cir. 1967); Smith v. Board of Education of Morrilton School District, 365 F.2d 770 (8 Cir. 1966). There is no reason to assume that it does not apply with equal force to the promotion of teachers to positions of principal and vice principal and other administrative posts. Cf. In Matter of Application of Council of Supervisory Associations of Public Schools of New York City, 23 N.Y.2d 458, 297 N.Y.S.2d 547, 245 N.E.2d 204 (1969).

■ It cannot be denied that the Newark Board of Education, under N.J. S.A. 18A:27–4, has the power to promulgate rules and regulations governing the promotion of teachers to administrative positions and to determine the criteria to be utilized in making such promotions, provided it does not practice racial discrimination. See decision rendered by the New Jersey Commissioner of Education on December 13, 1968, in Porcelli v. Titus, referred to in note 4 of this opinion. In Kemp v. Beasley, 389 F.2d 178 (8 Cir. 1968), the court noted that the primary responsibility for faculty selection must remain with the various Boards of Education and their officials, who have "broad and sensitive expertise" in the area. There appears to be no state law requiring that promotions to such positions as principal or vice principal be made on the basis of competitive examinations. This would seem to be solely a matter of contract between the Board and the teachers it employs. This Court, of course, is not concerned with any possible claim plaintiffs may have against the Board arising out of the contract of February 1, 1965. Similarly, the Court is not considering whether the Board had the power, in the abstract sense, to reconsider existing promotional procedures and alter them.[4] The sole

---

4. In the course of the present litigation, plaintiffs submitted this issue to the New Jersey Commissioner of Education. On October 22, 1968, the Commissioner, in a printed decision, held that the issue was not yet "ripe for adjudication" and remanded the matter to the parties "for whatever procedures may be appropriate toward a harmonious settlement of this controversy." On November 13, 1968, on appeal from that decision, the State Board of Education remanded the matter to the Commissioner with a directive to render a decision within one month. Pursuant to this mandate, on December 13, 1968, the Commissioner decided that the

question for decision is whether or not plaintiffs have established by a preponderance of the evidence that the Board suspended the existing promotional procedures for the purpose of discriminating against white applicants, and particularly, the plaintiffs in this case. Stated another way, did the Board discriminate against plaintiffs because they are white?

The parties have stipulated that there was, and is, racial imbalance on the administrative level. in the Newark school system. Paragraphs 4 and 5 of the stipulation read as follows:

4. The school population in the City of Newark in October 1961 was 67,134, and had a Negro population of 55.1%. In September 1968 the total school population was 75,876, with a Negro student population of 72.5%, reflecting an increase in seven years of 8,742 students and a percentage increase of negro (sic) students of 17.4%.

5. For the school year 1967–1968 there were 259 administrative and supervisory positions (Superintendents and Assistants, directors of departments, Supervisors; Senior High, Junior High, Elementary, Special Schools; principals and vice-principals, department chairmen; supervisory assistants and teachers to assist principals), of which 27, or 10% were held by negroes (sic).

It was also stipulated that of the 72 Principal positions in existence in the Newark school system prior to August 22, 1968, none were held by Negroes. Also, with respect to 64 Vice Principal positions, only 3 were held by Negroes. And of the 48 Department Chairman positions, only 1 was held by a Negro. The

proofs also show that there have been only 4 Negro principals and vice principals and 1 Negro department chairman in the history of the Newark school system.

In the main, the evidence adduced in behalf of plaintiffs consisted of a number of exhibits and the testimony of witnesses taken on oral deposition. The exhibits show, as has already been stated, the action taken by the Board of Education on May 28, and August 22, 1968; the promotional procedures that existed prior to May 28; those persons eligible for promotion by virtue of their scores on the promotional examinations given prior to May 28; and the results of the written promotional examinations given in June, 1968, which examinations were not utilized in making appointments. Plaintiffs contend that the exhibits, and the testimony of the several witnesses examined on oral deposition, establishes that defendant took into consideration the color of the applicants' skin as one of the criteria in recommending and appointing persons to fill positions as acting principals and vice principals, and that the purpose behind the Board's suspension of the existing promotional lists, and in abolishing the examination system for appointing principals and vice principals, was to make more Negroes available for promotion and to discriminate against the white plaintiffs because of their race.

It is apparent that while the promotional lists were in effect, the number of Negroes available for promotion to positions of principal and vice principal was limited. For example, on the Principal's List (P–3 in evidence) and the Vice Principal's List (P–4 in evidence), only 1 Negro appeared on each list as being eligible for promotion. Defend-

actions taken by the Newark Board of Education were appropriate and were therefore sustained as a legitimate exercise of the power vested in that body by New Jersey law. In passing, the Commissioner noted that the issue of racial discrimination was being pressed in the federal courts and therefore made no findings with respect to that issue. How-

ever, he observed that "the mere consideration of the factor of race is not PER SE in conflict with established constitutional principles", citing for support Morean v. Board of Education of Montclair, 42 N.J. 237, 200 A.2d 97 (1964) and Fuller v. Volk, 230 F.Supp. 25 (D.N.J.1964).

ant Titus, the Superintendent of Schools, admitted that until the Board suspended the existing lists, few, if any, Negro principals could be appointed. Mrs. Gladys Churchman, a member of the Board of Education, testified that, in order to appoint qualified Negroes, it was necessary to suspend the promotional lists. Two other members of the Board, Gerard F. McCune and John Cervase, testified to the same effect, as did the Board's president, Harold Ashby.

The testimony also revealed an overall dissatisfaction on the part of members of the Board and members of the administrative staff with the examination procedure for making promotions. Defendant Titus testified that "the examination procedure as it has existed since roughly 1953 did not in 1968 necessarily produce the best people for responsible positions of leadership. * * * I felt that in 20 years, 25 years that had elapsed since the procedure was first or originally modified or developed, the conditions in the City had changed, educational philosophy had changed. There was a high (sic) premium on sensitivity than had existed hitherto. And for that reason I welcome the opportunity of reviewing the whole procedure. * * * Sensitivity, as I see it, is that element of a person's personality which makes him aware of the problems that are unique to the ghetto, unique to the circumstances surrounding being a member of a minority group, sensitive to educational needs that go (sic) out of the deprived conditions in many of our—most of our school neighborhoods. * * * As I see it, and I see it very clearly in my own mind, anybody who is in a position of leadership today in a city like Newark has to be able to identify, has to be able to understand." In fact, Superintendent Titus testified that he never equated "high standing on an examination procedure with the ability to successfully administer a school."

There was also testimony by Benjamin Epstein, Assistant Superintendent of Schools in charge of secondary education. He stated that in his opinion, the judg-ment of qualified and experienced administrators at the head of a school system can be as effective as an examination procedure in selecting personnel. Mrs. Churchman, the Board member previously mentioned, expressed the view that the Newark school system was "losing good people because of the exam procedure", and that the suspension of the promotion lists would "provide an avenue for people who were not on the list who did not pass the exam, whether they were white or black, to be able to be appointed." On the other hand, Board member Cervase testified that in his opinion, "the best way to get qualified administrators was through the examination procedure." In any event, on May 28, 1968, the Board, by a vote of 5 to 3, suspended the appointment of persons from the existing promotional lists.

The record makes it clear that "race", in its broadest connotation, played a part in the Board's decision to suspend the promotion lists and abandon the examination system. Most, if not all, of the witnesses, in the course of their testimony, mentioned the paucity of Negro administrators in the Newark school system. Plaintiffs admit that, in the numerical sense, there was a racial imbalance in the administrative ranks of the Newark school system. Defendant Titus testified that he favored suspension of the promotional lists because such lists "didn't represent the kinds of racial mix that I feel is most important in accomplishing an educational program in the City of Newark." Similar views were expressed by Board members and other witnesses. In short, there was an awareness of the racial problems, frequent discussions about the lack of non-white administrators, and the need to obtain qualified black administrators.

A fair evaluation of the record supports the conclusion that the promotional lists were suspended and the examination system abolished, not simply to appoint Negroes to promotional positions, but to obtain for these positions qualified persons, white or black, whose qualifications were based on an awareness of,

and sensitivity to, the problems of educating the Newark school population. The racial breakdown of the Newark schools, as stipulated by the parties, has been set forth earlier in this opinion. In support of the claim that an "educational crisis" exists in Newark, Dr. Donald Wesley Campbell, Director of Reference and Research for the Newark Board of Education, testified regarding certain statistical surveys made by his department. These surveys revealed that, on the reading level, the median score achieved by Newark school children tested in the third grade, ranged from 5 months to one year and 3 months below the national median; that the median score achieved by Newark school children, again tested for reading, in the sixth grade, ranged from 1 year and 1 month to 2 years below the national median; and that in the level of arithmetic achievement of Newark school children in the seventh grade, their scores ranged from 1 to 2 years below the national median. It is obvious that the inability to read well will result in poor achievement in all studies.

Dr. Richard Trent, Associate Professor of Urban Education, and Executive Officer of the Education Opportunity Program at Brooklyn College, University of the City of New York, testified that the median scores achieved by the Newark school children, considered in conjunction with the racial composition of the Newark schools, the dropout rate in the system, and the number of principals who are Negro, indicated to him that "if you want significant change in the school performance of the ghetto population, it is highly advisable to involve as much as you can competent black professionals * * *." Dr. Trent further testified that the presence of a black man in authority is evidence to the children that if they study, they, too, can achieve. In addition, he stated that it is easier for a Negro to discipline ghetto children, and for a Negro to involve Negro parents in the educational process. This witness stressed, however, that it is more important that the individual be

qualified than that he be black, and that in some circumstances a white person would be able to fulfill these requirements. Dr. Trent's testimony is relevant in this case because the record discloses that these are precisely the concepts that motivated the Board in the actions it took.

The Court is satisfied that in abolishing the examination procedure, there was no intention on the part of the Board to discriminate against white persons or exclude them for consideration for promotional positions. No inference of any such intention can be gleaned from the record. The testimony of several of the witnesses, some of which has been recited in this opinion, shows that, despite a desire to provide an avenue for the appointment of more Negro administrators, the ultimate objective of the Board was to promote those persons most qualified to suit the needs of the Newark school system. There is nothing in the record to indicate that the Board was attempting to appoint Negroes in numbers proportionate to the school population.

The Court is in agreement with plaintiffs' argument that the selection, placement, retention, or promotion of teachers in such a way as to create or perpetuate all white or all black schools, violates the equal protection clause of the Fourteenth Amendment. This is the fundamental teaching of the cases cited by plaintiffs. Rolfe v. County Board of Education, 391 F.2d 77 (6 Cir. 1968); Kemp v. Beasley, 389 F.2d 178 (8 Cir. 1968); Kelly v. Altheimer, 378 F.2d 483 (8 Cir. 1967); Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967); United States v. Jefferson County Board of Education, 372 F.2d 836 (5 Cir. 1966); Smith v. Board of Education of Morrilton School District, 365 F.2d 770 (8 Cir. 1966). However, these cases involved factual situations completely different from the facts in the case at bar. They arose in areas where, as a result of attempts to desegregate schools, the need for black teachers in previously all-Negro

schools was decreased. Thus, black teachers were dismissed summarily, indicating that they were not hired as teachers in a school system, but rather as black teachers in a black school system. But in Newark, there is a fully integrated school population on the student and teacher level. There is no claim that a dual system exists in Newark. In fact, the record would indicate that most of the schools are predominantly populated by non-white children. In such a situation, and in light of the evidence adduced in court that the absence of meaningful representation on the administrative level was retarding the educational development of the school population, the action taken by the Board in this case can only be viewed as a legitimate function of the Board. Cf. Fuller v. Volk, 230 F.Supp. 25 (D.N.J.1964), and same case, 250 F.Supp. 81; also, Olson v. Board of Education, 250 F.Supp. 1000 (E.D.N.Y.1966). And this is especially so where the proofs fall short of showing that qualified white applicants were excluded from consideration or discriminated against.

Consideration will now be given to the appointments made by the Board on August 22, 1968. It must be stressed that these were only temporary or acting appointments. The person so appointed receives remuneration above that received before promotion ($75.00 to $100.00 a year above his normal salary), but his position does not become permanent until the Board takes further action. An acting position exists for a one year period. There was a great deal of testimony concerning the method by which these acting appointees were selected.[5] From the record it appears that the selection procedure began in late June or early July in 1968. The initial recommendations for the temporary or acting appointments were made by the Assistant Superintendents, and they covered positions on the junior high and high school level, as well as on the elementary level. These recommendations would then be discussed with the Deputy Superintendent of Schools and thereafter checked to see if the applicants were properly certificated. A list of the recommended persons would then be submitted to the Superintendent, defendant Titus, who would then make his recommendations to the Board, which took the necessary formal action of making the appointments. The record indicates that the Board members made no independent evaluation of the candidates recommended, but relied upon the expertise of the Superintendent and his staff in appointing those persons whose names were submitted.

As has already been indicated, defendants admit that one of the criteria used in making the appointments in the instant case was the color of the applicant's skin. However, this does not, in and of itself, demonstrate discrimination against white applicants. In fact, the record shows that the Board has no intention of limiting appointments to Negroes, or that consideration was given only to black applicants. The great preponderance of the evidence supports the contention of defendants that the persons recommended and eventually appointed were considered by the appointing authority to be the best qualified individuals for the available positions. Indeed, when the Board considered the recommendations of the Superintendent and his staff, some members of the Board were not even aware of the race of those whom they voted to appoint.

5. It should be noted that there is no allegation by plaintiffs, nor any indication in the record, that white persons serving in administrative positions were removed therefrom in order that new appointments be made. Persons selected for advanced acting positions were not screened and chosen from a pool as mentioned in footnote 3 of this opinion. This system was not put into effect because, soon after the examination system was abolished, the parties agreed to maintain the status quo, pending a determination by this Court of the legality of the actions taken by the Board. However, when the time comes to make permanent appointments, the screening and pool procedures are intended to be fully utilized.

■ As previously stated the Board, on August 22, 1968, made 55 temporary or acting appointments.[6] Of that number, 35 positions were filled by white persons and 20 by Negroes. Especially relevant is the fact that on the secondary level, where no promotional lists existed, 31 white applicants and 13 Negroes were appointed. Plaintiffs urge the Court to ignore the appointments made on the secondary level and to only consider those made on the elementary level, where of the 11 appointments made, 7 went to Negroes. This the Court declines to do. Plaintiffs are challenging certain action taken by the Board, which they claim is unlawful and discriminatory as to them. The Court is of the opinion that the action taken by the Board must be viewed as a whole in evaluating the charge of discrimination. If it was the intention of the Board to discriminate against white applicants, it would have been a simple matter to accomplish this in connection with the secondary level appointments, where no promotion lists existed. However, the appointments actually made, considered in light of the record clearly rebuts any motivation or intention on the part of the Board to discriminate against qualified white persons in making promotions.

■ Relating the Board's action of August 22, 1968 to the plaintiffs, the record, taken as a whole, indicates clearly that they were not excluded from promotional positions because of their race. Plaintiffs argue that because they were not appointed to available elementary positions, and some Negroes were, the fact that race was considered by those making the recommendations for appointments, is proof of discrimination. To be sure, 7 Negroes were appointed to elementary positions, but so were 4 white persons. Surely, racial consideration did not affect the selection of these four individuals over plaintiffs. Moreover, the record reflects that plaintiffs Justin and Cohn were appointed to the administrative positions of Teacher to Assist Principal on August 22. The appointment of white applicants, some of whom appeared on promotion lists, and some of whom did not, and the failure to appoint other white applicants whose names appeared on promotion lists, might arguably lend support to the statements appearing in the record, that the examination system did not necessarily supply persons possessing the qualifications deemed essential for promotion by the Superintendent and his staff. Be that as it may, when the time comes for the Board to make permanent appointments to available administrative positions, those plaintiffs whose names appear on the promotional lists are assured of consideration under the "pool" provisions of the memorandum set forth in note 3 of this opinion. It cannot and will not be assumed that this pool procedure will be utilized in such manner as to discriminate against those persons who have been placed in the pool because of their standing on prior examinations.

■ As to those plaintiffs whose names do not appear on existing pro-

6. It has been stipulated that the racial breakdown of the appointments made on August 22, 1968, is as follows:

| Level | Acting Position | White | Negro |
|-------|-----------------|-------|-------|
| Elementary | Principal | 1 | 4 |
| | Vice Principal | 0 | 2 |
| | Teacher to assist Principal | 3 | 1 |
| Secondary | Principal, Senior High | 2 | 0 |
| | Principal, Junior High | 1 | 0 |
| | Vice Principal, Senior High | 8 | 4 |
| | Vice Principal, Junior High | 3 | 0 |
| | Teacher to assist Principal | 3 | 8 |
| | Department Chairman | 11 | 0 |
| | Supervisory Assistant, Junior High | 3 | 1 |
| Total | | 35 | 20 |

motional lists, there is nothing in the record to cause the Court to assume that future promotions will not be made on the basis of merit. It is true that the criteria for appointments to promotional positions had not yet been established when this case was heard, but it is the Court's understanding that such criteria will be worked out by the Superintendent and his staff and representatives of the Newark Teachers' Association. There is no reason to believe that when such criteria are established, appointments will not be made in a manner that will provide the Newark school system with persons best qualified to perform their respective tasks. It is not the function of this Court to determine the educational soundness of the action taken by the Board in this case. It is sufficient to state that the Board had the authority to take such steps as it deemed necessary and proper to promote the educational welfare of the Newark school community. Of course, in taking such steps, the Board could not infringe upon the right of white teachers to be free from discrimination because of race. Cf. Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Kemp v. Beasley, 389 F.2d 178, 189 (8 Cir. 1968); In Matter Of Application Of Council Of Supervisory Associations Of Public Schools Of New York City, 23 N.Y.2d 458, 297 N.Y.S.2d 547, 45 N.E. 2d 204, 208–210 (1969). On the basis of the record in this case, the Court finds that plaintiffs have not established by a preponderance of the evidence that racial discrimination was intended or practiced against them. This finding makes it unnecessary for the Court to consider the evidence presented by the intervenors in an attempt to show that, in the past, the promotional examinations were conducted in such a way as to discriminate against Negroes. The Court makes no finding on this issue.

It might not be amiss to make some reference to that phase of plaintiffs' prayers for relief wherein they ask for an injunction to prohibit defendants "from taking any punitive measures against the plaintiffs on account of their race or for enforcing their civil rights under this action." There is no need for any such injunction. Plaintiffs had every right to bring this action. Any reprisal for doing so would subject the persons responsible to severe penalties. See Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966). This Court does not for one moment believe that defendants will take any such punitive measures.

For the reasons stated herein, the complaint will be dismissed with prejudice, but without costs. Counsel for defendants will please submit an appropriate order consented to as to form by counsel for plantiffs and intervenors or bring on a motion for settlement or form of order to be entered, on notice.

This opinion shall constitute the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.