108 N.J. Super. 301 (1969)
261 A.2d 364
VICTOR PORCELLI (AND NINE OTHERS), PLAINTIFFS-APPELLANTS,
v.
FRANKLYN TITUS, SUPERINTENDENT, AND THE NEWARK BOARD OF EDUCATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 15, 1969.
Decided November 7, 1969.
*303 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Joseph F. Walsh argued the cause for appellants (Messrs. Bracken & Walsh, attorneys).
Mr. Victor A. DeFilippo argued the cause for respondents.
Mr. Arthur J. Sills, Attorney General of New Jersey, filed a statement in lieu of brief (Mrs. Virginia Long Annich, Deputy Attorney General, of counsel).
The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiffs, ten members of the teaching staff of the Newark Board of Education (herein Newark Board), appeal pursuant to R.R. 4:88-8 (now R. 2:2-3 (a)) from a final determination of the New Jersey State Board of Education (herein State Board). The latter affirmed a decision of the Commissioner of Education which held that the action of the Newark Board, in suspending its promotional procedure and its eligibility lists and in instituting a new policy for promotions, was a lawful exercise of discretionary authority.
Plaintiffs here urge that the Newark Board (1) is bound by the terms of an outstanding employment agreement with the Newark Teachers' Association (herein NTA), the exclusive bargaining agent for all teachers in the Newark *304 school district, and (2) may not lawfully disregard or modify by unilateral action the terms of that agreement.
The Teachers' contract under review, dated June 19, 1967, covers the period from February 1, 1967 to February 1, 1970 and provides in pertinent part:

Article X PROMOTIONS
A. The positions of principal, vice principal, * * * shall be filled in order of numerical ranking from the appropriate list, which ranking shall be determined by written and oral examinations. * * *

* * * * * * * *

Article XXII GENERAL
* * *
F. The Board hereby amends its rules and regulations to the extent necessary to give effect to the provisions of this Agreement.

* * * * * * * *

Article XXIV MUTUALITY OF OBLIGATION
The Board and the Association will make every good faith effort to carry out the spirit as well as the letter of this Agreement, subject to law. * * *
Subsequently, on June 30, 1967, Newark Board adopted an amendment to its Rules and Regulations, section 505.4 thereof, to conform to Article X of the agreement and to provide specifically that "all promotional lists shall expire after four years."
On May 28, 1968, after a public hearing, the Newark Board passed a resolution suspending the making of any appointments to the positions of principal or vice-principal from promotional lists "pending an evaluation by the Board of Education of the present procedure for making such appointments, effective after October 1, 1968." Thereafter no appointments for the positions of principal or vice-principal were made from promotional lists.
On August 22, 1968 defendant Franklyn Titus, Superintendent of Schools of the City of Newark (herein superintendent), proposed to the Newark Board that written examinations and numerical listings according to any test scorings be abolished and replaced by a general pool of qualified candidates selected by a screening committee, from *305 which appointments would be made by the superintendent. The recommendations[1] were adopted by the Newark Board on that date.
Prior to that August meeting, the numerical ranking lists included three plaintiffs for the position of principal and three plaintiffs for the position of vice-principal. The remaining four plaintiffs had passed written examinations *306 during the 1967-68 school year for the position of principal or vice-principal but because of the suspension resolution they had no opportunity to take the oral part of the examination. All plaintiffs, however, were placed in the general pool of qualified candidates but lost the advantage they had acquired by being on the eligibility lists.
At this juncture we note that plaintiffs also filed suit in the United States District Court, District of New Jersey, against defendants superintendent and the Newark Board alleging a violation of their civil rights under 42 U.S.C.A. § 1983 in that defendants, acting under color of law, abolished an established examinational procedure in order to appoint Negroes to positions for which they would not otherwise be eligible and made appointments to such positions solely on the basis of race, and that plaintiffs *307 were thereby discriminated against solely because they are white. Damages and a mandatory permanent injunction against defendants were sought in that litigation. The court permitted the American Civil Liberties Union and The Law Center for Constitutional Rights to file an amicus brief, and, after a plenary hearing, a decision was rendered which was adverse to plaintiffs. Their complaint was dismissed with prejudice. Porcelli v. Titus, 302 F. Supp. 726 (D.N.J. 1969).
In the instant proceedings plaintiffs, in substance, demand a rescission of the challenged action of the Newark Board and an enforcement of the promotional system prescribed by the agreement of June 19, 1967. They argue on appeal, as they did before the State agencies, that the Newark Board, in changing its procedure for promotions, violated its own rules and regulations and unlawfully breached its negotiated contractual obligation with the NTA.
There can be no doubt, as plaintiffs contend in their brief, that the teachers in the Newark school system, as public employees, had the right to organize and, through organizational representation, the right to make proposals which could be effectuated by an enforceable agreement between the school board and its organized employees. N.J. Const. (1947), Art. I, "Rights and Privileges," par. 19. This right was expressly recognized in the recently adopted "New Jersey Employer-Employee Relations Act." L. 1968, c. 303, N.J.S.A. 34:13A-1 et seq. The enactment mandates that negotiations concerning terms and conditions of employment shall be made in good faith and that when an agreement is reached such terms and conditions shall be embodied in a signed agreement. N.J.S.A. 34:13A-5.3. It also provides that "Nothing in this act shall be construed to annul or modify, or to preclude the renewal or continuation of an agreement heretofore entered into between any public employer and any employee organization, *308 nor shall any provision hereof annul or modify any statute or statutes of this State." N.J.S.A. 34:13A-8.1.
In view of those fundamental concepts and directives, it is urged that the instant employment contract must be binding and enforceable against all parties, including the public employer. Clifton v. Passaic County Board of Taxation, 28 N.J. 411 (1958), and Hackensack Bd. of Education v. Hackensack, 63 N.J. Super. 560 (App. Div. 1960), are cited for the proposition that "Our statutes cannot be so interpreted as to impute to the Legislature a vain or futile act."
Thus, the critical issue before us is whether the Newark Board had the right to adopt unilaterally an educational policy relating to promotions which was inconsistent with the procedure contemplated by an agreement voluntarily entered into with its employees. We need not for purpose of this opinion consider the issue as to what extent a board of education may contractually bind its successor board or boards, since here the Commissioner found specifically that the contract in question was authorized by the Newark Board in 1967 and ratified by its 1968 and 1969 successor boards.
Defendants justify their action on the grounds of statutory authority and educational necessity. They refer to the constitutional requirement that the Legislature provide for a thorough and efficient system of free public schools, N.J. Const. (1947), Art. VIII, § IV, par. 1; the legislative implementation thereof delegating the operation of public schools to local boards of education, N.J.S.A. 18A:10-1; the broad discretionary powers vested in such boards with respect to the day-to-day functioning of the schools within their jurisdiction, N.J.S.A. 18A:11-1; and the board's authority enunciated under N.J.S.A. 18A:27-4:
Each board of education may make rules, not inconsistent with the provisions of this title, governing the employment, terms and tenure of employment, promotion and dismissal, and salaries and time and mode of payment thereof of teaching staff members for the district, *309 and may from time to time change, amend or repeal the same, and the employment of any person in any such capacity and his rights and duties with respect to such employment shall be dependent upon and governed by the rules in force with reference thereto. [Emphasis added]
These statutory provisions and N.J.S.A. 34:13A-1 et seq., supra, are in pari materia, and it is axiomatic that such enactments are to be construed together "as a unitary and harmonious whole, in order that each may be fully effective." Clifton v. Passaic County Board of Taxation, supra., 28 N.J., at 421. Accord, Brewer v. Porch, 53 N.J. 167, 174 (1969).
The argument of defendants then runs that the action of the Newark Board on May 28 and August 22 was in accord with its Rule 103.28 which reads: "Any rule of the Board may be suspended by a two-third vote of the entire Board * * *." Therefore, since plaintiffs are employed under board rules which, as provided by law, may be changed, amended or repealed from time to time, and their employment contract of June 19, 1967 sets forth in its terms that it would become part of the board's rules and expressly provides that the agreement is "subject to law," the decision to suspend and modify the promotional system was consonant with the statutory powers with which the Newark Board was vested.
In considering those contentions the Commissioner properly observed that:
* * * the law is not to be construed to imply that a board of education is not legally and morally bound to comply in good faith with the terms of any agreement consummated with its employees. Nor is a board permitted to enter into such an agreement with the implicit reservation that it can abrogate the terms thereof on any pretext. Such drastic, unilateral action can be sustained only in the face of a real threat or obstacle to the proper operation of the school system, or in an emergency of equal importance. [Emphasis added]
He found that the Newark Board deemed it essential to alter its method of selecting and appointing administrative *310 and supervisory personnel for the reason that the educational needs and aspirations of the school children and the local community were being thwarted by the dearth of representation by Negro staff members in the leadership councils of the schools. Also, it was found that defendants endeavored, without success, to accomplish the desired result within the framework of the existing agreement; the dilemma that confronted the board was expressed in these words:
It could abide by its agreement and make no deviation of any kind in its rules and ignore public demand for change, or it could respond to what it conceived to be the needs of the school system and the desires of the community by modifying a part of its agreement against the wishes of a majority of the teachers' association. Faced with such a Hobson's choice the Board made its decision in terms of its overriding obligation to serve the needs of the children and the community.
It is significant that the challenged action of defendants eventuated after the period between July 13 and 17, 1967, when the City of Newark was violently shaken by widespread civil disorders. Judicial notice of those tragic incidents was taken in State v. Chandler, 98 N.J. Super. 241, 243 (Cty. Ct. 1967). But see A & B Auto Stores, Inc. v. Newark, 103 N.J. Super. 559 (Law Div. 1968). It is only reasonable to assume that the city and state school authorities were seriously concerned about the impact of such disturbances upon the students and their parents, the community at large, and the general administration of the school system throughout the city.
Superintendent Titus testified at the hearing before the Commissioner that the interest of sound educational policy, philosophy and procedure requires minority group representation on the administration policy-making level "of a school system such as Newark's." Indeed this thesis is not questioned by plaintiffs, nor do they suggest that the amended promotional procedure would not tend to achieve this objective. Furthermore, the witness in referring to his *311 testimony in Porcelli v. Titus, supra, acknowledged that there was a "clamor" from the community and certain members of his staff with respect to the insufficiency of qualified black personnel in the administrative positions of the Newark schools.
In that federal proceeding it was stipulated that in September 1968 the school census was 75,876, with a Negro student population of 72.5%. It was also stipulated that of the 72 positions of principal in existence prior to August 22, 1968, none were held by Negroes, and with respect to the 64 vice-principal positions only three were held by Negroes.[2]
Furthermore, the trial judge in that case noted in his decision the comments of Mrs. Gladys Churchman, a member of the Newark Board of Education, who testified that "in order to appoint qualified Negroes, it was necessary to suspend the promotional lists." The president and two other members of the board gave evidence to the same effect. The court also made reference to the testimony proffered by Dr. Donald Wesley Campbell, Director of Reference and Research for the Newark Board of Education, in support of the claim that an "educational crisis" existed in Newark. That factual assertion can be buttressed by recourse to public documents and writings dealing with recent urban problems. See, for example, Report for Action, Governor's Select Commission on Civil Disorder (February 1968), at 75  a general discussion of infirmities in the *312 Newark school system, and at 170  the conclusion that "The Newark Public School System is in a state of educational crisis."[3]
The Commissioner held that the subject agreement, "whatever it may be labeled," could not constitute a surrender by the Newark Board of its responsibility under the law to conduct the schools under its charge "in the best interests of the children to be served." For a clear expression of this overriding purpose of public schools, he referred to Bates v. Board of Education, 139 Cal. 145, 148, 72 P. 907, 908 (Sup. Ct. 1903), and the following statement repeated in McGrath v. Burkhard, 131 Cal. App.2d 367, 377, 280 P.2d 864, 871 (D. Ct. App. 1955): "The public schools were not created, nor are they supported, for the benefit of the teachers therein, * * * but for the benefit of the pupils, and the resulting benefit to their parents and the community at large."
We endorse the principle, as did the court in Kemp v. Beasley, 389 F.2d 178, 189 (8 Cir.1968), that "faculty selection must remain for the broad and sensitive expertise of the School Board and its officials," and this we do notwithstanding an existing employment agreement where subsequent conditions make impossible a literal performance of all of its terms. The essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty or the like "rather than that it is scientifically or actually impossible." 6 Williston, Contracts (rev. ed. 1938), § 1931, p. 5410. Cf. 6 Corbin, Contracts, § 1336, p. 384 (1962).
*313 As approvingly noted in Newark v. North Jersey Dist. Water Sup. Comm., 106 N.J. Super. 88, 106 (Ch. Div. 1968), affirmed o.b. 54 N.J. 258 (1969), "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive or unreasonable cost" (quoted from 1 Beach, Contracts, § 216, p. 269 (1896)). A fortiori, the concept of impossibility should prevail where a particular provision in a school contract is rendered impracticable by subsequent events demanding changes in an educational program in order to give meaningful effect to an overriding public policy. Moreover, it is well settled that specific performance will not be decreed if the performance to be compelled is contrary to public welfare. Restatement, Contracts, § 369, p. 671 (1932).
This court has recognized that a contract is to be considered "subject to the implied condition that the parties shall be excused in case, before breach, the state of things constituting the fundamental basis of the contract ceases to exist without default of either of the parties." Edwards v. Leopoldi, 20 N.J. Super. 43, 54 (App. Div.), certif. den. 10 N.J. 347 (1952). Stated differently, "There is no more intrinsic sanctity in stipulations by contract than in other solemn acts of parties which are constantly interfered with by Courts of Equity upon the broad ground of public policy or the pure principles of natural justice." 2 Story, Equity Jurisprudence (13th ed. 1886), § 1316, p. 648. These legal principles are nonetheless applicable in situations involving a collective bargaining agreement, despite "suggestions that such contracts might, in some respects, well be considered sui generis." Adams v. Jersey Central Power & Light Co., 36 N.J. Super. 53, 70 (Law Div. 1955). See Kennedy v. Westinghouse Electric Corp., 16 N.J. 280, 284-287 (1954).
Implicit in the agency's decision here under review are findings that the Newark Board was in fact faced with "a real threat or obstacle" to the proper administration of its school system. The record before us, and the attendant *314 public events that may be judicially noticed, support the findings of the Commissioner that the ex parte adoption of new promotional rules by the Newark Board, notwithstanding lack of approval by a majority of the NTA, was "warranted and appropriate."
The determination of the State Board that the Newark Board acted lawfully, in the particular circumstances of this case, is affirmed.
NOTES
[1] The Superintendent recommends the approval of the plan listed below for appointment to promotional positions.

The objective of this plan is to have one standard of selection.
The existing procedure of written and oral examinations for promotional positions shall be abolished. A pool of candidates for promotional positions shall be established. The procedure for placement in the pool is described below. The Superintendent would make appointments to promotional positions from candidates in the pool.
Procedure for Establishing a Pool of Candidates for Promotional Positions
1. Candidates shall submit a formal application.
2. Candidates in order to be eligible for inclusion in the pool shall meet training, experience, and State certification requirements as established for each promotional position. These requirements must be met prior to interview by the screening committee.
The following are minimum experience requirements:
a. For Principals:
Five years of successful contractual teaching experience in the Newark Public Schools, or ten years of successful contractual teaching experience in schools outside of Newark, three years of which shall have been on a recognized administrative level.
b. For Vice Principals, Department Chairmen, and Junior High School Supervisory Assistants:
Three years of successful contractual teaching experience in the Newark Public Schools (with the attainment of tenure).
3. Candidates for the pool shall not be restricted to members of the Newark Public School staff.
4. Candidates shall be screened by a committee composed of:
a. Assistant Superintendent in charge of Personnel or a Director on his staff.
b. Assistant Superintendent from the appropriate school level.
c. A Newark school administrator from the appropriate level.
d. An educator from outside the Newark school system.
e. A Newark school teacher from the appropriate school area.
No teacher shall serve on a screening committee who is a candidate for promotional position.
5. The screening committee shall recommend to the Superintendent those candidates judged to be worthy candidates for promotion. These successful candidates shall constitute the pool from which promotions shall be made.
6. The criteria for use by the screening committee shall be co-operatively developed by representatives of the NTA and the Superintendent's staff.
7. New candidates shall be selected for the pool once each year in March.
8. The pools shall be in existence for a period of five years from the date of their establishment. At that time this entire procedure will be subject to reevaluation.
9. As a result of negotiations with the NTA, it is recommended that all individuals who were on unexpired promotional lists, upon their request, be automatically placed in the pool for the appropriate area without prejudice. It is further agreed that all such individuals will be sent notices to this effect by the Department of Personnel.
10. As a result of negotiations with the NTA, all individuals who applied and paid the required fees for participation in the examinations which have been suspended by the Board of Education shall automatically be considered as having applied for inclusion in the pool. It is further agreed that all such individuals will be sent notices to this effect by the Department of Personnel. It is also recommended that all such fees for the suspended promotional examinations be returned.
NOTE: The Negotiations Committee of the Newark Teachers Association have agreed to the above and will recommend this procedure to the NTA Senate at their next meeting. [The membership of NTA did not ratify the proposal of its negotiating team.]
[2] Paragraphs 4 and 5 of the stipulation read as follows:

4. The school population in the City of Newark in October 1961 was 67,134, and had a Negro population of 55.1%. In September 1968 the total school population was 75,876, with a Negro student population of 72.5%, reflecting an increase in seven years of 8,742 students and a percentage increase of negro [sic] students of 17.4%.
5. For the school year 1967-1968 there were 259 administrative and supervisory positions (Superintendents and Assistants, directors of departments, Supervisors; Senior High, Junior High, Elementary, Special Schools; principals and vice-principals, department chairmen; supervisory assistants and teachers to assist principals), of which 27, or 10% were held by negroes [sic].
[3] See also Report of The National Advisory Commission on Civil Disorders 236, 242 (March 1, 1968); Supplemental Studies for The National Advisory Commission on Civil Disorders 133 (July 1968); Farnsworth, "The City in the Recent Past," 1 Rutgers-Camden L.J. 1, 11 (1969); cf. Fiss, "Racial Imbalance in the Public Schools: The Constitutional Concepts," 78 Harv. L. Rev. 564, 617 (1965).