Boston M. CHANCE and Louis C. Mercado et al., Plaintiffs-Appellees,

v.

The BOARD OF EXAMINERS, Defendant-Appellant,

and

The Board of Education of the City of New York and the Chancellor of the City School District, Defendants-Appellees.

No. 458, Docket 76–7348.

United States Court of Appeals, Second Circuit.

Argued March 28, 1977.

Decided Aug. 11, 1977.

Supplemental Opinion Oct. 13, 1977.

Saul Z. Cohen, New York City (Julius Berman, Howard A. Jacobson, Barry P. Schwartz, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellant.

Elizabeth B. DuBois, New York City (George Cooper, Jeanne R. Silver, Jack Greenberg, Deborah M. Greenberg, and Legal Action Center of the City of New York, Inc., New York City, of counsel), for plaintiffs-appellees.

Deborah G. Rothman, New York City (Leonard Koerner and W. Bernard Richland, Corporation Counsel, New York City, of counsel), for defendants-appellees.

Leonard Greenwald, New York City (Frankle & Greenwald, New York City, and Gretchen White Oberman, New York City, of counsel), for amicus curiae Council of Supervisors and Administrators of the City of New York, Local 1, AFSA, AFL–CIO, SASOC.

Before GURFEIN and MESKILL, Circuit Judges, and NEWMAN, District Judge.[*]

GURFEIN, Circuit Judge:

A child who was in the first grade when this action was begun is now ready to enter junior high school. The case is on appeal to this court for the fourth time.[1] In the intervening seven years, the U.S. District Court for the Southern District has been engaged in the intermittent monitoring of the selection of principals and assistant principals of schools in New York City. The issue as it has narrowed on this appeal turns largely on an interpretation of the New York State Constitution and provisions of the New York Education Law. The federal question of racial discrimination in the selection of supervisory person-

---

[*] Honorable Jon O. Newman, U.S. District Judge, District of Connecticut, sitting by designation.

1. The opinions on the earlier appeals are reported at 458 F.2d 1167; 496 F.2d 820; and 534 F.2d 993.

**1082**

nel as the cardinal issue has, at this juncture, receded.

The Board of Examiners ("Examiners")[2] appeals from a judgment of the U.S. District Court for the Southern District of New York (Pollack, J.), entered on July 7, 1976, which modified a Final Judgment on Consent entered July 12, 1973 (Mansfield, J., as District Judge), and a plan pursuant thereto approved by the District Court (Tyler, J.), by order entered March 25, 1975.

## I

This action was commenced in September 1970 by the filing of a complaint alleging that prior examinations prepared and administered by defendant Board of Examiners for selection and licensing of supervisors[3] in the New York City school system discriminated against blacks and persons of Puerto Rican descent in violation of the Fourteenth Amendment and failed to accord with the requirements of New York State law.[4] Title VII was not then applicable to governmental bodies.[5] The complaint, a class action, sought to enjoin the Board of Examiners from giving examinations to determine the "merit and fitness" of applicants " . . . which had not been prepared and validated in accordance with the latest standards of professional psychological testing . . . ," and with the requirements of New York law.

On plaintiffs' motion for a preliminary injunction, the District Court found that no purposeful or intentional discrimination was being practiced. However, on the basis of statistical data concerning the comparative pass-fail rate for supervisory positions of

blacks, Puerto Ricans and whites during the preceding seven years, 330 F.Supp. 203, 209, the court found a substantial disparity in the examination performances of blacks and Puerto Ricans compared to whites, and held that there was a substantial likelihood that this disparity evidenced a *prima facie* case of unintentional discrimination. Judge Mansfield (then District Judge) concluded that the Examiners[6] had failed to meet their "heavy burden" of making a "strong showing" that the tests were job-related, and issued a preliminary injunction barring the administration of any examination until the Examiners revised their tests to meet the standards articulated in the court's decision. 330 F.Supp. 203.

On appeal, this court affirmed the entry of the preliminary injunction, 458 F.2d 1167 (April 5, 1972). Basically, we agreed with the District Court's legal analysis that there was a *prima facie* case of *de facto* discrimination, and concluded that the District Court was not clearly erroneous with respect to its factual findings and conclusions and had not abused its discretion.

Both Judge Mansfield in his decision on the preliminary injunction (330 F.Supp. at 224) and this court in its affirmance (458 F.2d at 1179) expressed the expectation that new examinations would be speedily developed.

Following this court's 1972 decision, the Board of Examiners moved in the District Court on June 1, 1972, to modify the preliminary injunction to permit the development and administration of new examinations pursuant to a proposal submitted therewith.

---

2. The Board of Examiners is a public body established by New York Education Law, § 2569, consisting of five members, including the Chancellor of the New York City School District.

3. Supervisory positions include "principals, assistant principals, administrative assistants, etc." 330 F.Supp. 203, 205.

4. The plaintiff class consists of members of minority groups alleging suffering from cultural disabilities as a result of discrimination, who are eligible to take, or have already failed, supervisory examinations.

5. In 1972, Pub.L. 92–261, § 2(1), 86 Stat. 103, amended 42 U.S.C. § 2000e(a) to include "governments, governmental agencies, political subdivisions" within the coverage of the Act.

6. The Board of Education has never answered plaintiffs' complaint, maintaining that since supervisory examinations were "the sole statutory responsibility" of the Board of Examiners, it rather than the Board of Education, should defend. As we shall see, the present Board of Education has almost completely reversed its position.

On the return date, Judge Mansfield, stating that the parties were more knowledgeable than the court about the creation of future test procedures, urged both sides to make a serious effort to reach agreement on a plan for new examinations, which he envisaged as requiring "specific examination procedures for numerous positions."

Thereafter, the parties commenced settlement discussions which, almost one year later, led to the execution of a Stipulation of Settlement by plaintiffs and defendant Board of Examiners and the Chancellor of the City School District. Pursuant to its terms, a final Judgment on Consent was entered on July 12, 1973 after notice to the class, with respect to defendant Board of Examiners and Chancellor (the "Consent Judgment"). Simultaneously, the District Court entered a parallel order with respect to defendant Board of Education ("the Board") which had refused to agree to the settlement.[7]

The Consent Judgment established a two-part plan. Part One provided for an "interim" system for the selection and licensing of supervisors, essentially through on-the-job performance evaluations conducted by the Board of Examiners. Thus, supervisors appointed on an *acting* basis in accordance with the preliminary injunction could expeditiously be evaluated and obtain licenses without passing the customary plenary examination.[8]

Part Two was an undertaking by the parties to establish by agreement,

" . . . a new comprehensive supervisory selection system for the New York City School System which will provide for the selection of supervisors in the future on the basis of 'merit and fitness' and without unlawful discrimination. . ."

The Consent Judgment expressly provided that within six months, the "interim" system would be phased out and replaced by a permanent plan ultimately to be incorporated as part of the Consent Judgment.

Thereafter, the parties did submit to the District Court a Permanent Plan which was acknowledged to have been agreed to by all parties, except for two unresolved issues which the parties submitted to the court for resolution.[9] During the proceedings to resolve the two open issues, the parties continued to acknowledge their general acquiescence in the Permanent Plan.

On March 25, 1975, the District Court (Tyler, J.), entered an "Order Modifying Final Judgment and Order" (the "Tyler Order") which approved the Plan submitted by the parties in May 1974 (with additions relating solely to the two previously unresolved issues), incorporated it as part of the Consent Judgment, and authorized the defendants to prepare and administer examinations pursuant to it and thereafter to issue licenses based upon the results of such examinations.[10]

Under the Tyler Order, as modified, the permanent licensing of supervisors was to consist of a Step 1 "Test" and a Step 2 "evaluation procedure" designed to effect "non-discriminatory personnel selection policies without abandoning the essential elements of a merit system." The Step 1 "Test" involved the issuance of provisional licenses to those who passed a plenary ex-

---

7. Because the Board had failed to answer the complaint, yet refused to join in the Stipulation of Settlement, plaintiffs moved for a default judgment against the Board. Although the District Court was not willing to enter a default judgment, it did enter the parallel order referred to above.

8. In fact, over 1100 supervisors have to date been licensed through this "interim" system, many of them members of plaintiffs' class.

9. The two issues did not pertain to the nature and scope of future supervisory examinations. These issues concerned: (1) provisions regard-

ing *reporting* by the defendants to plaintiffs during the course of implementing the new Permanent Plan; and (2) a procedure for selecting consultants to be used by the defendants in undertaking certain functions under the Permanent Plan.

10. Because the Board of Education agreed, in a letter dated March 10, 1975, to be bound by the Consent Judgment originally joined only by plaintiffs and the Examiners, the 1975 order also provided that the Judgment bind all the parties in the action.

amination developed by the Examiners based upon a job analysis of the supervisory positions prepared by the Board of Education; the Step 2 evaluation procedure involved the issuance of permanent licenses to those who serve on the job in a position for one year and who pass a "Step 2" on-the-job performance evaluation by the Examiners.

It will be seen that this plan, to which all parties—including the Board of Education—consented, provided as a minimum prerequisite for provisional licensure some kind of examination, administered by the Examiners, designed to test for the job requirements established by the Board. It was assumed that the Examiners would develop the examination on the basis of the criteria set forth in the State Constitution and statutes discussed below. It was Judge Tyler's view that "the Community is entitled to the competitive examination licensing procedure, which its legislature has determined appropriate, as soon as possible. The Community is also entitled to a system which satisfies constitutional standards." Opinion of April 1, 1975.

In the two years after the judgment was entered, the Board did not give the Examiners the job analysis criteria needed for the preparation of examinations. Although the Board had been furnished with three prototype job analyses by its consultant, the American Institute for Research by the Spring of 1975, the analyses were not turned over to the Examiners on the express ground that the Board believed them to be inadequate.

In January, 1976, the Examiners complained to the District Court at a pre-motion conference that the Board of Education was not diligently proceeding to carry out its responsibilities under Step 1 of the Plan. On the representation that more time was necessary, a six-week adjournment was granted. In March, 1976, at a second pre-motion conference, the Examiners moved to implement the original Plan. But instead of furnishing the job analyses required by the Plan, the Board moved to substitute a "modified" plan for supervisory selection and licensing which would eliminate entirely the requirement that job analyses be prepared. Under the "modified" plan, provisional licenses would be issued to every applicant who satisfied the minimum educational and experience requirements prescribed by the State Commissioner with such additional requirements as might be established by the City Chancellor.[11] The role of the Examiners was to be limited to verification of the resumes submitted by applicants to ensure that the minimum qualifications set by the Chancellor were met. The Examiners were also to prepare and "evaluate and comment on" a written essay examination to demonstrate skills in written expression about matters relating to the position. The appointing power, as it related to elementary and junior high schools, would reside in the Community School Boards. The "modified" plan further provided that permanent licenses would be issued to those deemed qualified by on-the-job performance, as determined by the Community School Boards.

As proposed by the Board and the plaintiffs, the modified plan did not assign to the Examiners the role of assessing the on-the-job performance. However, Judge Pollack, recognizing that state law had to be considered, insisted that this function be given to the Examiners.

Thus, faced with the choice of directing implementation of the 1975 Tyler Plan, which depended upon agreement of the Board and the Examiners for its further implementation, and the "modified" plan which he thought to be more feasible, Judge Pollack chose the latter.

 In choosing between these alternative systems for prospective licensure of supervisors, Judge Pollack was not presented with any federal constitutional problems. Both the plan in the Final Judgment and the plan in the Modified Judgment appear to us on their face to meet constitutional

11. This portion of the Modified Plan is essentially a restatement of the minimum statutory prerequisites for licensure as a supervisor. *See* N.Y. Educ. Law § 2590-j(2) (McKinney 1970).

standards. Any federal constitutional frailty will be revealed, if at all, only as a plan is actually developed.[12]

The Examiners wish to have the complaint dismissed entirely on the ground that there never was a finding of *intentional* discrimination and that *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), holds that unintentional discrimination alone is not the sole touchstone of a constitutional violation. The plaintiffs and the Board of Education wish to end the federal supervision by an affirmance which permits the Modified Plan to go into operation. In essence, all parties, for one reason or another, wish to be rid of continuing federal supervision.

The appellant Examiners contend, moreover, as we shall see, that the plan provided for in the Modified Judgment, in any event, even on its face violates New York State law and is inconsistent with the civil service system in New York.

## II

■ The Examiners contend, assuming that we refused to dismiss on the *Washington v. Davis* argument, that the District Court had no power to alter an essential feature of the final consent judgment—plenary examinations based on job analysis—to which all parties had consented.[13] We are not dealing here with a plan which is already in effect under a consent decree. The plan provided for is still inchoate for want of agreement between Board, Examiners and the plaintiff class. In any event, we have no doubt of the power of the District Court to modify an ongoing injunction. In *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932), the Court rejected the argument "that a decree entered upon consent is to be treated as a contract and not as a judicial act." "It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be."

Mr. Justice Cardozo went on to hold significantly, however, that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Id.* at 119, 52 S.Ct. at 464. Of course, where there has been a supervening statutory change of consequence, "[t]he parties have no power to require of the court continuing enforcement of rights the statute no longer gives." *System Federation No. 91 v. Wright*, 364 U.S. 642, 652, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961).[14] Thus, a balance must be struck between the policies of *res judicata* and the right of the court to apply modified measures to changed circumstances.[15]

Recognizing the *power* of the District Court to modify the judgment even if the modification is not within the four corners of a *stated* reserved power in the decree itself, we must determine, nevertheless, whether the modification was within the

---

**12.** Judge Tyler recognized that there would be no need further to invoke the District Court's jurisdiction "except possibly, after a test has actually been developed and examinations are to be administered." Opinion of April 1, 1975.

**13.** Indeed, the plaintiffs themselves, in another context, argue that the judgment is *res judicata* and not subject to modification because of the supervening doctrine allegedly represented by *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See* Part II, *infra*.

**14.** There was no statutory change here, but the Examiners treat the decision of the Supreme Court in *Washington v. Davis*, *supra*, as comparable. We deal with this question *infra*.

**15.** The Examiners argue that the court had no power to impose substantial restraints upon them going well beyond those agreed to in the consent decree, citing *Ford Motor Co. v. United States*, 335 U.S. 303, 69 S.Ct. 93, 93 L.Ed. 24 (1948). We do not view this appeal, however, as an ordinary dispute between the government and a private party. Here the Examiners are a proper adversary party to assert public rights and to protect the alleged integrity of the statutory scheme rather than to protect their own prerogatives. The public interest weighs heavily in the balancing test of a court of equity.

proper exercise of discretion by the District Court.[16]

We can well understand the frustration at the stalemate which resulted from the requirement of joint action by the Examiners and the Board. To get on with the assignment in the two-step plan, the Board had to come forward with job analyses for at least three prototype supervisory jobs, after which the Examiners were to prepare "content validated" studies for the Step 1 examinations. The Examiners under the plan existing could not move until the Board moved. And, though the Board was hostile to the plaintiffs in the early stages of the litigation, a revised political composition of the Board has now brought it closer to the plaintiffs' position than to that of the Examiners. Instead of compromising the issue of job criteria, the Board has joined forces with the plaintiffs to abrogate the earlier plan in essence and to substitute the new plan we have described.

■ We think, as Judge Friendly said in *King-Seeley Thermos Co. v. Aladdin Indus. Inc.*, 418 F.2d 31, 35 (2d Cir. 1969), that a decree may be modified "where a better appreciation of the facts in the light of experience indicates that the decree is not properly adapted to accomplishing its purposes." But we also think that some form of hearing is generally required to make so vital a determination. *Cf. United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968); *King-Seeley Thermos, supra*, 418 F.2d at 35 ("if Aladdin could *show* that, in the light of experience . . . .") (emphasis added).

Whether the impasse has been caused more by the obstinacy of the Board than by the self-justification of the Examiners, we cannot discern at this distance. We know that, because of changed ethnic and racial components of the elementary school population, there was a thorough revision of the structure of the New York City school system by the Legislature in 1969. Decentralization became the key. Community school districts were created to take over many of the functions formerly performed by the central Board of Education. Yet in the midst of this revolutionary change, the Legislature saw fit to retain the Board of Examiners in the City of New York "to hold examinations whenever necessary," and "to prepare all necessary eligible lists . . ." as well as to "review the validity and reliability of examinations as well as examination procedures." N. Y. Education Law § 2569(1)(a), readopted in 1969.

■ It is difficult to gather from this expression of legislative intention, contemporaneous with decentralization, an acquiescence in the elimination of "examinations" as a prerequisite to eligibility or in taking the determination of the validity of the examinations out of the hands of the Examiners. We conclude that, without a finding that the Tyler judgment imposed "grievous wrong," *United States v. Swift & Co., supra*, or that the purposes of the decree have been achieved, *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), there is no basis for substituting a new plan for the plan decreed by Judge Tyler. And it would take an adversary evidentiary hearing, at least, before a finding could properly be made that "the decree is not properly adapted to accomplishing its purposes"— that under no circumstances can a constitutionally valid plan be wrung from it.

Before we decide whether to remand for an evidentiary hearing on whether the Tyler Plan has become unworkable, however, we must recognize that we also face serious ambiguities in the state law of education as it affects the City of New York, as we shall see more directly in Part IV. But first we turn to the pervasive argument of the Examiners that *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), has cut the underpinnings from the judg-

---

**16.** Though no formal Rule 60(b) motion was made, we think the District Judge treated the proceeding as such and relied on the provision that the court may relieve a party from a final judgment if "it is no longer equitable that the judgment should have prospective application." Rule 60(b)(5).

ment below and that the balance of the claim for relief must accordingly be dismissed.

### III

Appellants contend that *Washington v. Davis, supra,* fortified by *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), has destroyed the legal premise upon which the parties based their settlement and, indeed, upon which Judge Mansfield and this court accepted jurisdiction. They argue that the basis for a federal *constitutional* violation may not, under *Washington v. Davis,* be predicated merely upon the relative statistical success or failure of persons of different races on a qualifying examination, absent proof of *intentional* racial discrimination. As noted, both Judge Mansfield and this court, in its affirmance, had concluded that appellant engaged in no such *intentional* discrimination. Concededly, the present action was brought for an alleged constitutional violation, as was *Davis.* Nor was the complaint ever amended to seek relief based on the 1972 amendment to Title VII of the Civil Rights Act of 1969. Appellant concludes, as a *sequitur,* that we must therefore vacate the Consent Judgment and dismiss the complaint.[17]

The modified decree entered by Judge Mansfield contained three parts: (1) an injunction against the continued use of the examination then extant; (2) provision for an "interim" method of selecting supervisory personnel; and (3) provision for reporting back to the District Court of an alternative plan, when agreed upon, for determination of its constitutional validity.

17. The Supreme Court in *Washington v. Davis,* 426 U.S. at 244–45 n. 12, 96 S.Ct. 2040, 2050, cited, among others, our opinion on an earlier appeal, *Chance v. Board of Examiners,* 458 F.2d 1167, 1176–77 (2d Cir. 1972), with the comment that "to the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement."

As to the aspect of the consent decree which bars use of the old examination, the Examiners do not challenge that portion of the judgment; they make no claim of entitlement to revert to the old examination and formally disclaim any intention of doing so.

The Examiners similarly do not attack the validity of the interim relief granted. Pursuant to the 1973 Final Consent Judgment, over 1100 supervisors have been given permanent licenses. The Examiners disavow any intention "to disturb licenses issued, or other rights, privileges or perquisites obtained, under that Judgment." Because of this consent by appellant to the preservation of the *status quo ante Washington v. Davis,* we need not decide whether that decision might otherwise justify a divestiture of rights obtained under the Consent Decree. There is presently no case or controversy regarding *past* relief. This leaves only the issue of continuing relief of a permanent nature.[18]

The District Court gave no consideration to *Washington v. Davis* because that decision came down after it had made its ruling in open court on the motion to modify the judgment. The District Court has been given no opportunity to consider what effect, if any, *Washington v. Davis* has on the ongoing relief granted based on an alleged earlier misconception of what the *Constitution* requires in the light of the enactment of the Title VII Amendment in 1972 while the action was pending. On this aspect of the case, too, as well as on the question of modification, the initial application of the doctrine to the factual setting here, would ordinarily first be made by the District Court, and the normal course would be to remand.

18. Plaintiffs also argue that, even under *Davis,* the challenged examinations may be subjected at least to the "rational basis" test. They note that in *Washington v. Davis,* the District Court had expressly found that the examinations were rationally related to a legitimate state purpose.

## IV

We have concluded that we should not remand for consideration of *Washington v. Davis* on the claim for prospective relief, however. For we think that the pervading issues of state policy that now remain are more properly within the province of the state courts.

We agree with the Examiners that a federal court which is shaping a remedy for constitutional violations should, other things being equal, choose among alternatives the one which is consistent with state law. Judge Pollack was conscious of the problem, because he amended the "modified" plan to provide for the *Examiners* rather than for the Community Boards to effect the evaluations of on-the-job performance, in order to conform to what he believed to be the requirements of state law.[19] We are not sure that the amendment alone makes the Modified Plan conform to state law. The Modified Plan raises a serious question of state law and policy. We now address ourselves to that question.

Appellant Examiners contend that the Modified Plan runs afoul both of the New York State Constitution and of the New York Education Law. The state law affecting appointments to supervisory positions in the educational system of New York City is laden with ambiguity.

The Constitution provides in Article V, Section 6 as follows:

"Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive . . . ."

The Civil Service Law is administered generally by a state civil service commission, Civil Service Law § 5, but the duty of determining qualifications for appointment to *educational* positions, both teaching and supervisory, is vested in the State Commissioner of Education. The entire City of New York has its own special district, moreover, with its own Chancellor.

As we have noted, the elementary school system under the direction of the Central Board of Education was largely replaced by Community School Boards in 1969. § 2590-c. The Examiners, as we have seen, nevertheless, still retained specific duties involving the merit and fitness of candidates for teaching and supervisory service positions.

Thus, Education Law, Section 2590-j(3)(a)(1) provides:

"The board of examiners shall prepare and administer objective examinations to determine the merit and fitness of all candidates for teaching and supervisory service positions, other than the positions of chancellor, executive deputy city superintendent, deputy city superintendent, assistant city superintendent and community superintendent. Examinations for teaching positions may consist in part of the National Teachers Examination administered by the Educational Testing Service of Princeton, New Jersey."[20]

"Examinations for all supervisory service positions shall be open qualifying."[21]

Section 2590-j(3)(a)(2) also assumes that interview tests will be given by the Examiners under decentralization, because it requires them to "cause a verbatim record of all interviews tests to be made" and re-

---

19. The Board of Education also takes the position that the Modified Plan is consistent with state law. The Board took precisely the opposite position on an earlier appeal, *see* 496 F.2d 820, 822–24 (2d Cir. 1974).

20. At the same time, the Education Law provides that

"The board of education, on the recommendation of the superintendent of schools shall designate, subject to the other provisions of this chapter, the kind and grades of licenses which shall be required for service as principal, branch principal, etc." Section 2573(10).

21. This means that the appointing power need not choose the highest scorers on the eligible list which is created by the Examiners. *See Board of Education of City of New York v. Nyquist*, 37 A.D.2d 642, 643, 322 N.Y.S.2d 370 (1971), *aff'd*, 31 N.Y.2d 468, 341 N.Y.S.2d 441, 293 N.E.2d 819 (1973).

quired them to "furnish a transcript thereof to each failing candidate requesting the same at a reasonable fee."

The Modified Plan, as we have seen, provides for initial appointment on the basis of criteria set by the state Commissioner of Education, amplified by the City Chancellor, with no provision "for objective examinations" other than a written essay examination "to demonstrate skills in written expressions about matters relating to the position," and with no reference key for the weight, if any, to be given to the limited written examination. Though the permanent appointment to the supervisory position will be made after evaluation of on-the-job performance by the Examiners (based on Judge Pollack's amendment), the Examiners raise the question of whether the Modified Plan satisfies the requirements of state law, since permanent appointments would be given to persons who have taken no examination, other than the unrated written essay described. The questions raised are whether the Modified Plan conforms to the State Constitution and whether it conforms to a policy of the Legislature enunciated when it prescribed the duties of the Examiners. We turn first to the State Constitution to see whether its meaning, in this context, is unambiguous.

## A.

We can find no satisfactory precedent in the New York Court of Appeals which gives us a certain answer. That court has said, in general terms, that "[t]he discretion of the Legislature is limited to the field of the enforcement of that section of the Constitution [Art. V § 6]. It may not enact a statute which violates its mandate." *Hurley v. Board of Education of City of N. Y.*, 270 N.Y. 275, 279, 200 N.E. 818, 820 (1936). Nevertheless, it is true that after the Legislature had declared it to be the public policy of the state to encourage community interest in the public schools of New York City and to develop an educational program in the public schools concerned with local community needs (L.1967 ch. 484), the Court of Appeals upheld the creation by the City

Board of Education of the new position "Principal *Demonstration* Elementary School." It also upheld the temporary appointment of Demonstration Elementary School Principals based upon a relationship with disadvantaged communities, knowledge of their cultural level, and the like. *Council of Supervisory Associations v. Board of Education*, 23 N.Y.2d 458, 297 N.Y.S.2d 547, 245 N.E.2d 204 (1969). The court apparently accepted these criteria for temporary appointments only on condition, however, that competitive examinations would be given for *permanent* appointment, for which "specific and objective criteria of experience in the area of community-education programs" would be set up "in co-operation with the Board of Examiners." 23 N.Y.2d at 468, 297 N.Y.S.2d at 555, 245 N.E.2d at 210. The court, in rejecting the argument that the case would "break down the merit system in the civil service," emphasized that the decision was limited to the creation of new positions for new needs and "to fill them *temporarily* until lists based on examinations can be promulgated." 23 N.Y.2d at 469, 297 N.Y.S.2d at 556, 245 N.E.2d at 211 (emphasis added).

The transition from temporary to permanent appointment came directly in issue in *Board of Education v. Nyquist*, 37 A.D.2d 642, 322 N.Y.S.2d 370 (1971), *aff'd*, 31 N.Y.2d 468, 341 N.Y.S.2d 441, 293 N.E.2d 819 (1973). There Ms. Timpson, who had a license and tenure as an assistant to principal in the city school system was assigned as *acting* principal of an elementary school in 1961 and reassigned annually. She failed the license examination six times. She appealed from the Board's refusal to grant her a license as a principal. The Commissioner *directed* the Board to "adjust" her title. The Board appealed to the courts. By that time "the Legislature [had] established that the merit and fitness of appointees in the supervisory service of the City School District of the City of New York shall be ascertained by open qualifying examinations and directed that all appointments and assignments to such positions be made from persons on qualifying eligible lists based on such examinations (Education

Law §§ 2590-j, 2573, subds. 9–10)." *See* 37 A.D.2d 642, 643, 322 N.Y.2d 373 (1971). Both the Appellate Division and the Court of Appeals failed, however, to treat the direction of the Commissioner merely as a violation of the statute. Instead the Appellate Division held that the Commissioner's determination was "in direct contravention of the Constitution," (37 A.D.2d at 643, 322 N.Y.S.2d at 373), and the Court of Appeals agreed. Chief Judge Fuld wrote for a unanimous court:

> "The constitutional mandate that appointments to civil service positions be based on merit and fitness, to be ascertained by competitive examination where 'practicable,' may not be blinked or avoided. A civil servant may not, therefore, be appointed without the *required examination* to a higher position than his license or title calls for simply upon the basis of his satisfactory performance during temporary or 'out-of-title' service in such higher position."

31 N.Y.2d at 472, 341 N.Y.S.2d at 445, 293 N.E.2d at 821 (emphasis added).

The opinion also refers to "*constitutionally* mandated examinations" (31 N.Y.2d at 475, 341 N.Y.S.2d 441, 293 N.E.2d 819) (emphasis added), (rather than "legislatively mandated examinations") which may not be "bypassed." We are not certain whether this means that "examinations" are constitutionally mandated or, indeed, what the term "examinations" embraces. We are uncertain because in the smaller school districts of the state there is no examination for supervisors, who are selected on qualification by education and experience. Yet, we can hardly attribute to the Court of Appeals, the use of the term "constitutionally mandated" if the examination was not so mandated. The opinion appears to leave open the question whether permanent appointments to tenured positions in the civil service system may be made constitutionally without examination solely on the basis of on-the-job performance.[22]

The Appellate Division for the Third Department has recently held sufficiently objective an unassembled examination for Principal Nuclear Power Analyst which coupled minimum educational requirements with a training and experience rating key which allotted to each applicant, in addition to the lowest possible passing score of 70, a possible additional 22 points based upon professional experience, level of college training, supervisory experience, and other specified professional experience. *Bobrowich v. Poston*, 52 A.D.2d 976, 383 N.Y.S.2d 113 (1966). *See also Matter of Altman v. Lang,* 44 Misc.2d 751, 255 N.Y.S.2d 284, *aff'd*, 23 A.D.2d 820, 259 N.Y.S.2d 779, *aff'd*, 17 N.Y.2d 464, 266 N.Y.S.2d 975, 214 N.E.2d 157 (1965). The Modified Plan does not, however, provide for objective key ratings as do these cases. And whether the New York Court of Appeals would consider Step 1 of the Modified Plan as an "examination" is a question to which we have found no compelling answer.

We find the frontiers of state constitutional limitation to be obscure. Any resolution of the boundary by this court might bring us into conflict with the New York Court of Appeals in some other case.

### B.

Aside from any constitutional question, the Modified Plan is not necessarily consistent with the legislative division of responsibility between the Examiners and the Board of Education or, perhaps even with the policy implicit in the continued assignment of duties to the Examiners in the decentralization. A profound issue of poli-

---

**22.** Judge Cardozo said in *Matter of Ottinger*, 240 N.Y. 435, 441–42, 148 N.E. 627, 629, (1925): "We think a statute which declares in advance of the event that any and all positions now or at any time established in connection with this bureau, shall be . . . filled without examination of any kind, does not enforce the Constitution to the limit of the practicable." On the other hand, the court has also used a more flexible approach. "The mandate of the Constitution for the ascertainment of merit and fitness, so far as practicable, by competitive examination, may not be transformed into an interdict against the examinations which are best adapted for the demonstration of fitness." *Matter of Sloat v. Board of Examiners*, 274 N.Y. 367, 373, 9 N.E.2d 12, 15 (1937).

cy is involved on which we prefer not to pass judgment, since there are presently no discernible federal constitutional issues at stake.

The plaintiffs contend, on the other hand, that the question of state law is behind us. They say that we have already held, in the 1974 decision, that state law requirements have been met and that the Modified Plan, as a mere adaptation of the Interim Plan, is covered by. the doctrine of the law of the case.[23] Plaintiffs' reliance on our earlier decision is misplaced.

In the 1974 appeal we dealt with an attack upon the *interim* method of appointment approved by the District Court. It is true that the terms of the "modified" judgment are almost identical to those of the Interim Plan. However, in the 1974 appeal, Judge Feinberg, speaking for the Court, said:

> "This time, the issues before us are narrower since they go only to the propriety of the interim relief granted. As to the legality of the preliminary injunction under state law, the order does not authorize the *permanent* licensing of school supervisors without any examination. If it did, it would probably run afoul of the decision of the New York Court of Appeals in *Board of Education v. Nyquist*, 31 N.Y.2d 468, 341 N.Y.S.2d 441, 293 N.E.2d 819 (1973), construing N. Y. State Const., Art. V § 6, and relied upon heavily *by the Board of Education.*"

496 F.2d at 823 (emphasis added).

The upshot is that if, after remand, the District Court were to find the Tyler Plan to be impractical and would again decree the Modified Plan, we would be no nearer solving the question whether it conforms to state law. On the other hand, a reversion to the Tyler Plan would still not *again* raise the question of its adequacy under the federal constitution (or under Title VII) until it is implemented. At this stage of the litigation with the parties presenting two inchoate plans, either of which is federally acceptable, continuing supervision by the fed-

eral court of this vital state function seems inconsistent with the principles of federalism.

The State of New York is entitled to run its own schools, provided it does so in a constitutional manner. We should strain to escape "the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). And *see Goss v. Lopez*, 419 U.S. 565, 578, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

■ When Judge Mansfield originally enjoined the then current examination, he quite properly provided not only for interim relief but for a continuing supervision by the District Court to decide whether any new proposed examination would meet what was believed to be the constitutional standard. This was a proper exercise of federal jurisdiction, and we stress that it is generally a procedure that should be adopted by district judges. At that juncture there could have been no *Pullman* abstention, *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), for it was believed that no state court interpretation could have saved the existing examination procedures. *See McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). The case is now in a different posture. We must show an appropriate regard "for the rightful independence of state governments," *Beal v. Missouri Pacific R. Co.*, 312 U.S. 45, 50, 61 S.Ct. 418, 421, 85 L.Ed. 577 (1941).

■ As Mr. Justice Douglas wrote in *City of Chicago v. Fieldcrest Dairies, Inc.*, 316 U.S. 168, 172, 62 S.Ct. 986, 988, 86 L.Ed. 1355 (1942), "In this case that discretion [of a court of equity] calls for the remission of the parties to the state courts, which alone can give a definitive answer to the major questions posed." The State of New York has a vital interest in regulating education

---

**23.** At that point in the litigation it was the Board of Education, before its membership

shifted, who were the defenders of the State Constitution.

and the choice between the alternatives suggested by the parties should belong to the legislature of the state and the highest court. For the federal courts to make that choice, since we see no racially discriminatory impact in either plan, would seriously undermine control over education by the State of New York. It is time, therefore, to return the interpretation of the state constitution and statutory scheme to the New York courts. "Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

Nor is the *Pullman* paradigm of a provisional abstention relevant since no federal constitution review will be required until a plan is perfected and tested. *Cf. England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 416–17, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). This prospective federal relief, if it becomes necessary, can be handled in a new action brought under Title VII in which a sharper case or controversy will be drawn, with a lessening of continuing oversight by the federal court.

■ In directing the District Court to relinquish jurisdiction over permanent prospective relief, we emphasize that the Examiners have agreed not to revert to the original examination system, that they are judicially estopped from doing so, and that each of the plans under consideration is on its face, federally constitutional if properly implemented.[24]

Instead of remanding to the District Court for further consideration as we might have done, we accordingly reverse the order modifying the Final Consent Decree of Judge Tyler. We direct the District Court to enter a final decree affirming the continued validity of the provisions which provide for interim relief and which invalidate the former examination system, and to retain jurisdiction only to prescribe relief for a continuing interim period. We order vacation of those provisions calling for permanent supervision by the District Court, and also any restraint on the parties from seeking relief in the state courts, and encourage the seeking of such adjudication.[25] The Board of Education may promulgate its plan, subject to challenge in the state courts, and the Examiners may take their own action, subject to proper review by the state courts.

Appointments to supervisory positions shall continue to be made under the Interim Plan which we have previously validated, but only for a period extending until the promulgation of a plan by the Board of Education, or until June 30, 1978, whichever date arrives first.[26]

The judgment is reversed with direction to enter a decree in accordance with this opinion.

### Supplemental Opinion

Our attention has been called, by a motion to clarify our decision of August 11, 1977, to the fact that proceedings are still

---

**24.** We are not unmindful of the consideration that delay incident to abstention may serve to "chill" civil rights. *See Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). In *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), a narrow state court construction would not eliminate the constitutional challenge based on discrimination. Here the slate has been wiped clean by the happy eradication of the previous discriminatory examination.

**25.** As Justice Frankfurter stated in *Milk Drivers Union Local 753 v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 298–99, 61 S.Ct. 552, 557, 85

L.Ed. 836 (1941), even a "permanent" injunction

"is justified only by the [wrongdoing] that induced it and only so long as it counteracts a continuing [violation]. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted."

**26.** In the event such a plan is challenged, it will be up to the state court, in the exercise of a valid jurisdiction, to determine whether the present Interim Plan, or some variant of it, should be ordered pending the prosecution of such a suit.

continuing under this Court's mandate in Docket Nos. 75–7161 and 75–7164 regarding the problem of excessing supervisory personnel, *see Chance v. Council of Supervisors, et al.*, 534 F.2d 993 (1976), of which we had not been informed. Since no action of the District Court involving the mandate issued in the *Chance v. Council of Supervisors* appeal was called to our attention, the excessing problem was not a matter covered. Our decision herein does not foreclose the District Court from taking such action as it sees fit with respect to this matter, including a determination of any questions of jurisdiction that may be raised by the Council of Supervisors, subject to a separate appeal when the District Court determines the issues posed.

So that the mandate to be issued in the appeal we have just decided may be carried out without inadvertently creating confusion respecting the excessing portion of the litigation, the District Court is directed to sever the excessing issue from the main litigation, assign a new civil number to the "case" concerning the excessing issue, and proceed to carry out the mandate to be issued in this appeal concerning 70 Civ. 4141 (MP).