**BRIDGEPORT GUARDIANS, INC., et al., Plaintiffs–Appellees,**

v.

**Arthur J. DELMONTE, et al., Defendants,**

**City of Bridgeport, Defendant–Appellee,**

**AFSCME, Council # 15, Local 1159, AFL–CIO, Hispanic Society–Bridgeport Police Department, Inc., Intervenors–Appellants.**

**Docket Nos. 00–7456L, 00–7552XAP.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 18, 2001.

Decided: April 26, 2001.

with Dr. Israel's opinion, thus fails for these same reasons.

Harry B. Elliot, Jr., Meriden, CT, for intervenors-appellants.

Vincent M. Musto, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, for plaintiffs-appellees.

Barbara Brazzel–Massaro, Office of the City Attorney, Bridgeport, CT, submitted papers for defendant-appellee City of Bridgeport.

Before NEWMAN, LEVAL, and SACK, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the scope of a district court's authority to approve a stipulation entered as a remedial order in protracted litigation involving claims of racial discrimination in police disciplinary proceedings. The stipulation, agreed to by the City of Bridgeport and the Bridgeport Guardians ("Guardians"), an organization of Black police officers, shifts authority for police discipline in cases initiated by police officers (or other department personnel) away from the City's Board of Police Commissioners and vests such authority in court-appointed hearing officers. The Bridgeport Police Union, AFSCME, Council # 15, Local 1159, AFL–CIO ("Union") and the Hispanic Society–Bridgeport Police Department, Inc. ("Hispanic Society"), an association of Hispanic police officers, intervenors in the litigation, appeal from the March 27, 2000, order of the United States District Court for the District of Connecticut (Janet Bond Arterton, District Judge) approving the stipulation. They contend that the stipulation is not a remedy for discrimination and impermissibly violates state law and the Union's collective bargaining agreement. We conclude that the District Court was entitled to approve the stipulation, and we therefore affirm.

## Background

### I. The Original Remedy Order

This lawsuit began in 1978 when the Bridgeport Guardians filed suit under Title VII (employment discrimination) and Title VI (discrimination in federal assisted programs) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., §§ 2000d et seq., against the City of Bridgeport and the Bridgeport Police Commissioners, alleging racial discrimination in the Bridgeport Police Department ("BPD"). In 1982, after a bench trial, the District Court (T.F. Gilroy Daly, District Judge) found retaliation and discrimination in assignment, working conditions, and, significantly, the disciplinary process. With respect to the latter, the Court found:

> [I]f you are black and a member of the [Bridgeport Police Department], you are very likely to be punished—even fired—for conduct which might very well be ignored if you were white, or that you will be punished far more severely than you would be if you were white. The clear inference to be drawn from the cited examples, as well as from the statistics indicating that a far greater percentage of black officers than white officers have been subjected to disciplinary proceedings, is that defendants inten-

tionally discriminate on the basis of race in the amount and kind of discipline meted out to its officers.

*Bridgeport Guardians, Inc. v. Delmonte,* 553 F.Supp. 601, 614 (D.Conn.1982). Some weeks after issuing this ruling, in early 1983, the Court ordered its remedy ("the 1983 Remedy Order"). The 1983 Remedy Order provided for the appointment of a Special Master to review disciplinary actions undertaken by the BPD. The Special Master was ordered to:

a) Review any and all disciplinary actions instituted against any black officer who claims such action is racially discriminatory in purpose or effect; and to recommend an appropriate adjustment in any such action found to be racially discriminatory as to initiation, severity of sanction or otherwise.

b) Receive, investigate, and remedy all complaints of discriminatory treatment, racial harassment or slurs within the B.P.D. and, in appropriate cases, to bring disciplinary charges against those responsible and/or those supervisors who foster or permit such racial harassment to occur in violation of departmental rules.

c) Review any disqualification of any black officer seeking promotion which disqualification is based on grounds of any suspension, disciplinary action, or alleged misconduct upon which such sanction was premised occurring from 1978 to the date of this Order.

*Id.* at 619–620. The Order further provided that the Master's rulings would be subject to review by the District Court, under the clearly erroneous standard. *Id.* at 620. Atty. William H. Clendenen, Jr., of New Haven, was appointed Special Master, a position he still holds.

## II. The Grievance Procedure and the Collective Bargaining Agreement

In Bridgeport, police disciplinary matters have been adjudicated by the City's Board of Police Commissioners ("the Board"). State law gives the Board "sole power" to suspend or remove officers. *See* 1883 Conn. Spec. Acts 144. Under the City's Charter, the members of the Board are appointed by the Mayor, with the approval of the City Council. *See* Charter of the City of Bridgeport ("Charter"), Chapter 13, § 2(a) (1992). The Charter provides that the Board "shall be responsible for ... [s]uch other duties as may be assigned to it by law, this charter, the ordinances of the City of Bridgeport, collective bargaining agreements and court orders." *Id.* § 3(a)(6).

The City has a collective bargaining agreement ("CBA") with the Union. Under the CBA, the Police Chief is authorized to impose discipline of up to fifteen days' suspension without pay. *See* CBA, Art. 6, § 2. For discipline of greater severity, the CBA provides that "[d]isciplinary hearings shall be conducted by the Board of Police Commissioners," or a subcommittee of the Board. *See id.* § 3. The CBA also permits the Union to submit any disciplinary decision to arbitration. *See id.* Art. 6, § 7.

In 1984, the Special Master devised a procedure for filing complaints of discriminatory discipline directly with him, rather than through the statutory process contemplated by Title VII. By May 1999, the Special Master had issued 24 adjudications, 10 in favor of the City, and 14 in favor of the Guardians. In at least one instance, the Special Master ordered discipline of particular officers, bypassing not only Title VII procedures but also the procedure outlined in the CBA. The Union objected to the Special Master's assertion of authority to impose discipline directly,

but Judge Daly approved the Master's recommendation.[1]

## IV. Events Leading Up to the Stipulation

In 1990, the Special Master made a recommended ruling upon finding that the Board of Police Commissioners had not promptly disciplined officers, and that minority officers were brought before the Board more frequently and more expeditiously than similarly situated White officers. Whites were allowed to continue working for months while their cases were ignored by the Board; the cases of Black officers were brought up immediately. The Special Master ordered the Board to file within 30 days a plan to eliminate its backlog of cases, and to submit reports of its activities. The District Court overruled objections to the recommended ruling, and the City filed a notice of appeal.

Before the appeal was heard, however, the City and the Union agreed to streamline the disciplinary process, requiring the Board to hear cases within sixty days of filing. The Special Master then dropped his requirement that the Board file a plan to reduce the backlog, since he expected the reform negotiated by the City and the Union "to resolve most, if not all, of the previously identified issues concerning discipline," and also to ensure that no case remain pending more than three months. The City then withdrew its appeal.

On August 2, 1999, the Special Master, concerned that closer monitoring of the Board was necessary "to insure that the Board executes its disciplinary function in an efficient, fair and evenhanded manner," recommended to the District Court (a) that the required reports from the Board be filed in "strict compliance" with report deadlines (which he lengthened from monthly to quarterly), (b) that the reports conform to a newly prescribed form, and (c) that the Court hold further hearings to "consider what if any additional remedy should be imposed." His recommended ruling noted that "several reports were prepared and filed years late, after many requests from the Special Master."

During the decade of the Special Master's increasing concern with the Board's inadequate handling of disciplinary cases, one matter became a focus of particular attention. In 1990, Joe Ann Simmons,[2] a Black police officer, complained of discriminatory treatment by her supervisor James Halpin. The Special Master recommended, and the Court approved, an order prohibiting Halpin from supervising Simmons. A subsequent recommendation, also approved by the Court, ordered the BPD to defer Halpin's promotion to sergeant, pending further evaluations to be submitted to the Special Master.

Simmons complained four years later, in 1995, that she had been scheduled to work under Halpin. At a hearing, the BPD admitted that it had made a mistake, and promised to make changes to prevent a recurrence. In the course of protracted consideration of her renewed complaint, the Special Master stated, "For too long,

---

**1.** The Union objected before the District Court a second time when in 1997 the Guardians filed a complaint with the Special Master, seeking to have him determine whether the City had breached the 1983 Remedy Order by using random selection to establish seniority within the Police Academy Class of 1991–1992. The Union, the Guardians, and the City entered into a stipulation, ratified by the Special Master and the District Court, referring the matter to the State Board of

Mediation and Arbitration, to determine whether the random selection policy violated the CBA. Significantly, the stipulation provided that the Special Master could recommend enjoining compliance with any arbitral award if he found that compliance would violate the 1983 Remedy Order.

**2.** Thus spelled in papers she filed.

the Court has dealt leniently with members of the Department who have violated orders of the Court and Departmental Rules and Regulations.... The time is long over for the Court to tolerate any additional violations of its orders."

On October 31, 1997, after considering objections to his previously recommended rulings and holding hearings, the Special Master issued a final recommended ruling, finding that the Police Chief and five officers knew or should have known that Halpin was not to supervise Simmons, and failed to prevent Simmons' assignment under Halpin in 1995. This ruling proposed that the Chief subject all five individuals to the Department's disciplinary process; it also left intact prior recommendations for a $10,000 payment to the Guardians and suspension of the Chief for three days. After much delay, in February 1999, the Board of Police Commissioners exonerated the Chief and all five officers, including Halpin.

In April 1999, Judge Arterton, who had taken over the case after Judge Daly's death, heard the City's outstanding objections to the Special Master's proposals in the Simmons case and indicated that she would issue a written ruling partially approving his recommendations. The hearing ended with Judge Arterton encouraging the parties to enter mediation on the Simmons issue. "Do you contemplate that the Simmons/Halpin matter or any portion of it would be amenable to settlement?" After receiving a pessimistic assessment from the Guardians' lawyer and a positive assessment from the City's lawyer, Judge Arterton began asking about a broader mediation: "How do we move ahead to accomplishing the objectives of the [1983] remedy order from the larger standpoint?" This time, both lawyers responded positively, with the Guardians' lawyer emphasizing that "what needs to be resolved [is] the underlying problem," *i.e.,* "a very deeply ingrained difficulty with racial attitudes in the department." To this Judge Arterton responded:

To the extent that this [Simmons issue] is a lightning rod, [or] any of those issues [are], the problem is going to be that the continued flow of complaints is indicative of something wrong. Whether or not the complaints are eventually held to have merit is not the relevant point. They are still coming. And so we all would agree, I'm sure, that an institutional change from within [has] the highest likelihood of making permanent and successful change rather than having to be imposed by court order.

As I listen to you I see that perhaps we have come to that point where that ought to be explored. So, let me, in keeping with that spirit, ask you to begin doing, thinking[,] exploring how the larger picture of what you called the swirling morass can be dealt with. This is not an easy project to contemplate, but it does strike me that there is a real timeliness to it.

Judge Arterton issued her written ruling on the Simmons matter a few weeks later. She declined to order the recommended $10,000 payment, but remanded the case to the Special Master to determine whether any lesser sanctions were necessary to ensure compliance with the Court's future orders, and to compensate the Guardians for the expense of litigating the Simmons matter. With respect to the Chief's three-day suspension and the exoneration of the other officers, Judge Arterton ordered further proceedings before the Special Master to determine the appropriateness of the Board's exonerations of the officers involved. The Court also prohibited any permanent promotions of the officers involved. Finally, Judge Arterton said that she would convene a hearing to review the

Special Master's findings with respect to contempt sanctions and discipline.

The City filed a notice of appeal with respect to Judge Arterton's decision. A few months later, the Special Master issued his August 2, 1999, recommendation, which required the Board to make renewed efforts to eliminate its backlog and to issue prompt and detailed reports. Meanwhile, the City and the Guardians began to engage in mediation before Robert C. Zampano, a former District Judge.

IV. Mediation and the Stipulation

Against the background of the Special Master's increasing concern with the Board's inadequate handling of disciplinary cases, and prompted by Judge Arterton's suggestion at the April 1999 hearing on the Board's refusal to discipline the officers responsible for the Simmons incident, the City and the Guardians entered mediation. The Union initially participated in mediation, but backed out once the City refused to submit to interest arbitration, as allegedly required by the CBA, over the structural changes in the Board's operation that were being negotiated. In October 1999, the Union filed a complaint with the Connecticut State Board of Labor Relations, alleging a failure to bargain under state law.

The mediation resulted in a stipulation ("the Stipulation"), which the Guardians and the City filed with the District Court in January 2000. The Stipulation included the following specific changes in the BPD's disciplinary procedures for complaints initiated by police officers:[3]

—replacing the Board with "Hearing Officers" nominated by the mayor, appointed by the District Court (with the Special Master's help), to serve in all

serious disciplinary cases except those initiated by citizen's complaint;

—requiring the Hearing Officer to issue written decisions, obliterating certain procedural rules;

—requiring the department to defend its actions with evidence.

The Stipulation also specifies that the Simmons dispute and the attendant proceedings and remedies are moot.

At this point, the Union and the Hispanic Society intervened and were granted party status for the limited purpose of contesting the Stipulation. They objected to the Stipulation on the grounds advanced on this appeal, i.e., that it was beyond the remedial power of the District Court and contrary to state law and the CBA.

The District Court overruled their objections:

[E]ven though such substitution of the hearing officer for the Board of Police Commissioners as the City's designated agent changes that provision in the collective bargaining contract without union consent, it is axiomatic that operation of the Title VII Remedy Order with the narrow modification proposed by the parties' stipulation, would preempt any contrary state law.

(citations omitted). Judge Arterton also noted that it had been "almost a decade" since the Special Master first noted a deficiency in the disciplinary process,

and that the Union has never previously sought to intervene or to appear before the Special Master on this issue. The Court is fully satisfied that the necessity for this change is well established by the record of prior proceedings and findings, and observes that there is no indication

---

3. As a result of a consent decree in Barros v. Walsh, B–482 (D.Conn.1973), modified, id. (D.Conn.1985), the Board must continue to hear police misconduct complaints filed by civilians.

that the future workload pressures on the Board of Police Commissioners will be any less so as to mitigate the current shortcomings in providing prompt, even handed disciplinary processing.

The District Court "approved and adopted" the Stipulation in a well-reasoned ruling, entered as an Order of the Court on March 27, 2000. The Union and the Hispanic Society timely appealed.

### Discussion

#### I. The Nature of the District Court's Order

Judge Arterton's opinion approving the Stipulation characterized her action as a "remedy order," expressly rejecting the notion that the stipulation was a "consent decree." We understand the Judge to be saying that the authority for her ruling was not merely the original parties' consent, but, in addition, the Court's conclusion, after notice to the Intervenors and an opportunity for them to be heard, that a supplemental remedy was needed to effectuate the original 1983 Remedy Order. Thus the issues are whether Judge Arterton exceeded her discretion by modifying the 1983 Remedy Order, and whether her modification permissibly overrode state law and the CBA.

#### II. Justification for the Stipulated Modification

■ The Union argues that Judge Arterton's Order had nothing to do with Title VII, and was instead a freelance reform of the BPD's disciplinary process. In her written ruling, Judge Arterton found that her Order approving the Stipulation was justified because of the history of discrimination in the disciplinary process, because

the Board's "workload pressures" had prevented it from making prompt, "even handed" decisions, and because the same pressures had prevented the Board from making the reports needed to monitor the Board under the 1983 Remedy Order.

Even though Judge Arterton did not explicitly base her remedy order on a new finding of current discrimination, she was not required to do so as a prerequisite to modifying the 1983 Remedy Order. First, it is clear that her decision was only a modification of the 1983 Remedy Order. That Order provided: "This Court shall maintain continuing jurisdiction in this matter to insure complete and continuing compliance with all aspects of this Order." 553 F.Supp. at 620. The 1983 Remedy Order was based on a finding that the disciplinary process treated Blacks and Whites differently, and its open-ended wording directed the Special Master to "remedy all complaints of discriminatory treatment, racial harassment or slurs within the B.P.D." *Id.* at 619.[4]

■ Decrees may be modified even in the absence of additional violations or changes in law or fact. *See EEOC v. Local 638, Sheet Metal Workers'*, 753 F.2d 1172, 1185 (2d Cir.1985) (no additional violations required; District Judge to be "guided by the sound exercise of his equitable discretion"), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). The Stipulation would probably have been justified as a remedy in 1983 and was fully justified 17 years later after the many years of at least partial non-compliance with the requirements of prompt and fair processing of disciplinary complaints by police officers and of timely reports of

---

4. While it is unusual for jurisdiction to continue to be asserted for as long as it has been in this case, long-term monitoring sometimes occurs in "structural" Title VII cases like this

one. *See, e.g., EEOC v. Local 638,* 81 F.3d 1162, 1168 (2d Cir.1996) (court-appointed Administrator still on the job even as "case approaches its twenty-fifth birthday").

compliance. *See Association Against Discrimination in Employment v. City of Bridgeport*, 710 F.2d 69, 74 (2d Cir.1983) (structural remedies are "open to ... improvement when a better understanding of the problem emerges") (internal quotation marks omitted).

## III. Overriding State Law

■ The Union contends that Judge Arterton's order impermissibly overrides the state law provision giving the Board of Police Commissioners "sole power" to suspend police officers. *See* 1883 Conn. Spec. Acts 144. We disagree.

Title VII explicitly relieves employers from any duty to observe a state law "which purports to require or permit" any discriminatory employment practice. 42 U.S.C. § 2000e-7. The 1983 Remedy Order recognized that the BPD's handling of police disciplinary matters was a discriminatory employment practice, and the experience of recent years has indicated that the vesting of authority in the Board to discipline officers, including suspension, has continued to "permit" the backlogs that contributed to the discrimination Judge Daly sought to eliminate. We have consistently recognized that, in some circumstances, state law requirements may be displaced in order to effectuate Title VII remedies. *See Kirkland v. New York State Dept. of Correctional Services*, 711 F.2d 1117, 1132 n. 18 (2d Cir.1983) (remedy in settlement agreement); *Guardians Ass'n of New York City Police Department v. Civil Service Commission*, 630 F.2d 79, 104–05 (2d Cir.1980) (remedy in court order).

However, displacement of state law to remedy discrimination is a powerful weapon that must be used with care. As we have previously observed, employment discrimination remedies "should, other things being equal, choose among alternatives the one which is consistent with state law." *Chance v. Board of Examiners*, 561 F.2d 1079, 1088 (2d Cir.1977). In *Chance*, a remedy that appeared to violate state law was rejected because an equally effective alternative was available that conformed to state law requirements.

In the pending case, the Union has proposed no alternative remedy. Moreover, although the displacement of the Board's authority to discipline police officers is a significant structural alteration, it is an entirely appropriate response to the Board's long-standing discriminatory practice of letting complaints about White officers languish while processing expeditiously those against Black officers. Finally, as we discuss in Part V, *infra*, the displacement of state law is a temporary remedy that may be ended when circumstances indicate that it is no longer necessary.

## IV. Overriding the Collective Bargaining Agreement

■ Like state law, a collective bargaining agreement may be displaced, in some circumstances and to some extent, in order to remedy discrimination. In *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), the Supreme Court considered a discrimination remedy that altered provisions of a collective bargaining contract and imposed substantial financial burdens on employers and employer associations that were not themselves liable for the violations committed by the Union and a Joint Apprenticeship Training Committee ("JATC"). The Court distinguished between permissibly altering the contract and impermissibly imposing burdens:

To the extent that the remedy properly imposed upon the Union and the JATC requires any adjustment in the collective-bargaining contract between [the

employers] and the Union, it is entirely appropriate for the District Court to fashion its injunctive remedy to so provide, and to have the remedy run against [the employers] as well as the Union and the JATC. But the injunctive decree entered by the District Court as presently drawn treats [the employers] as if they had been properly found liable for the Union's discrimination.

*Id.* at 400–01, 102 S.Ct. 3141. "[A]djust[ing]" the collective bargain contract was "entirely appropriate"; the defect in the remedy identified by the Court was the imposition of substantial burdens on innocent parties, including mandatory expenditures, burdens of the sort imposed on those found liable for discrimination. *See id.* at 399–400, 102 S.Ct. 3141. Evidently the alteration of a bargained-for provision (or the lost opportunity to obtain some other provision that was abandoned when the altered provision was accepted) was not considered an automatic barrier to an otherwise appropriate discrimination remedy.[5]

■ In the pending case, the Union has lost its contractually assured right to have police discipline (in cases initiated by police complaints) administered by the Board. That alteration imposes no substantial burden on the Union; indeed, some aspects of the hearing officer procedure required by the Stipulation are more protective of police officers' rights than the current procedures of the Board. Even direct burdens are permissible where "necessary to grant complete relief," provided they are "minor and ancillary," *id.* at 399, 102 S.Ct. 3141 (citing *Zipes v. Trans World Airlines,* 455 U.S. 385, 399–400, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)).

We acknowledge the Union's legitimate concern that a Court's remedial power must not be put to the improper purpose of enabling one party to a collective bargaining contract to circumvent its provisions by agreeing with a Title VII plaintiff to changes that are not reasonably related to ending discriminatory practices. A stipulated remedy for a Title VII violation cannot camouflage an employer's attempt to obtain under court auspices what it could not obtain at the bargaining table. That concern is absent here. The substitution of court-appointed hearing officers for the Board is an entirely appropriate response to the combination of the Board's backlog and its persistent failure to submit reports needed to assess whether it has eliminated discriminatory discipline. There is no indication of the City's using the Court's remedial power as a subterfuge to gain arrangements it failed to obtain in collective bargaining.

## V. Duration of the Remedy

■ Neither the Stipulation nor the District Court's Order approving it specifies the duration of the Court's remedy or the circumstances under which the displaced authority of the Board may be fully or partially restored. The absence of such provisions is not fatal since the District Court retains continuing jurisdiction to assure compliance with the original 1983 Remedy Order, and ample authority to modify or vacate it and the Order now challenged, as circumstances warrant. *See* Fed.R.Civ.P. 60(b)(5) (permitting relief where "it is no longer equitable that the judgment should have prospective application").

Unlike some other cases involving discrimination remedies, we are not here con-

---

5. We do not rule out the possibility that, in some circumstances, the displacement of a provision of a collective bargaining agreement, required to remedy discrimination, could so undermine the legitimate expectations of the parties to the agreement as to justify rescission.

cerned with a particular practice or effect that can be expected to diminish and eventually end over time as remedial steps are implemented. *Cf. United States v. City of Yonkers,* 197 F.3d 41, 49–55 (2d Cir.1999) (remedy must end when "vestiges" of segregation eliminated). Here, the remedy attacks the discrimination in police discipline not by requiring even-handed treatment by the Board, but by displacing the Board's authority with that of impartial hearing officers. Thus, with respect to the handling of police discipline in cases initiated by police complaints, there will be no Board activity that can be monitored to determine when the Board's prior authority can safely be restored. That circumstance, however, does not mean that the displacement of the Board's authority must be permanent. In the future, several circumstances might make it appropriate to restore the Board's authority, either partially or fully. One example might be the Board's prompt and even-handed disposition of citizen complaints (currently remaining within its jurisdiction under the *Barros* consent judgment, *see* note 3, *supra*) for some reasonable period of time. Or the Board might at some point gain restoration of its authority by the arrival of new Board members and the adoption of procedures and compliance mechanisms designed to assure prompt and even-handed dispositions of police-initiated complaints. Our affirmance of the District Court's Order is without prejudice to a well-supported application to that Court, offering sufficient assurance that the Order may be safely modified and, at some point, terminated.

## Conclusion

The Order of the District Court is affirmed.